LAWRENCE G. WASDEN
Attorney General
State of Idaho

MARK A. KUBINSKI
Deputy Attorney General
Chief, Criminal Law Division

L. LaMONT ANDERSON, ISB #3687
Deputy Attorney General
Chief, Capital Litigation Unit
P.O. Box 83720
Boise, Idaho 83720-0010
Telephone: (208) 334-4539
Facsimile: (208) 854-8074
E-mail: lamont.anderson@ag.idaho.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| KATHERINE LEA STANFIELD, | ) | CASE NO. 4:22-cv-00057-REP |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | ANSWER AND BRIEF IN |
| | ) | SUPPORT OF DISMISSAL OF |
| JANELL CLEMENT, | ) | PETITIONER'S PETITION FOR |
| | ) | WRIT OF HABEAS CORPUS |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

COMES NOW, Respondent, Janell Clement ("state"), by and through her attorney,

L. LaMont Anderson, Deputy Attorney General, Chief, Capital Litigation Unit, and hereby

answers Petitioner's ("Stanfield") Petition for Writ of Habeas Corpus ("Petition") (Dkt. 1)

and moves for dismissal of the same.

*ANSWER AND BRIEF IN SUPPORT OF DISMISSAL OF PETITIONER'S PETITION*
*FOR WRIT OF HABEAS CORPUS - 1*

# I.
## INTRODUCTION AND GENERAL RESPONSES

Stanfield is being detained by the State of Idaho pursuant to a Judgment of Conviction filed on August 22, 2012, in the District Court of the Fourth Judicial District of the State of Idaho, County of Ada, by the Honorable Ronald J. Wilper, after a jury found her guilty of first-degree murder. (State's Lodging A-1, pp.726-29.)

All allegations and claims made by Stanfield are denied by the state unless specifically admitted herein. The Petition does not state grounds, which if true, would entitle Stanfield to federal habeas corpus relief. Because Stanfield's Petition was filed after April 24, 1996 (Dkt. 1), her case is governed by the standards and law contained in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). *See* Lindh v. Murphy, 521 U.S. 320, 336 (1997).

# II.
## FACTUAL AND PROCEDURAL BACKGROUND

The state relies upon the state courts' findings of fact and denies any claim, factually or otherwise, in Stanfield's Petition not specifically found by those courts. The facts surrounding Stanfield's conviction were detailed by the Idaho Supreme Court and are incorporated herein.[1] (State's Lodging B-4, pp.1-3.)

On December 11, 2009, at 3:35 p.m., Stanfield called 911 requesting medical assistance for W.F., the son of her daughter's ("Stacie") former boyfriend, Lance Wyatt ("Lance"). (State's Lodgings A-4, pp.400-02, 404; A-5, pp.2927-30; A-9, pp.5-13 (Exhibit

---

[1] "We begin with the facts found by the [Idaho Supreme Court], which are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1)." Thompson v. Runnels, 705 F.3d 1089, 1090-92 (9th Cir. 2013).

2, pp.1-9).) W.F. was approximately 2½ years old at the time. (State's Lodging A-9, p.6 (Exhibit 2, p.2), p.187 (Exhibit 88).) Stanfield had been tending W.F. for the prior four months most weekdays at her day care, as well as Stacie's two sons, J.D. and C.D. (State's Lodgings A-5, pp.2930-33; A-6, pp.2124-27.) Stanfield reported to the dispatcher that W.F. "threw himself down on the floor and hit his head" (State's Lodging A-9, p.6 (Exhibit 2)), was "gasping for air" (id., p.7 (Exhibit 2, p.3)), had a beating heart, but had stopped breathing (id., p.11 (Exhibit 2, p.7)), and was "acting like his eyes aren't there. He's like he's dreamed off into space" (id., pp.11-12 (Exhibit 2, pp.7-9)).

Paramedic Robin Freeborn was the first person to arrive at the home, and when she asked Stanfield what happened, she initially responded, "I don't know, I'm just the baby-sitter." (State's Lodging A-4, p.597.) When Freeborn examined W.F., "he was cyanotic, which is a blue, pale in color, and he was not breathing. The breaths were so few a minute that [she] thought that he had been in respiratory arrest, but he was in distress as he took a breath right as [she] reached him." (Id., pp.597-98.) There was "a large bump on his forehead" and his "pupils were fixed and dilated," which meant "he had a severe either spinal injury or a severe brain injury." (Id., pp.598, 606.) Stanfield told Freeman that W.F. had no medical issues, but "[h]e is very clumsy. He throws himself down all the time. He trips and falls all the time." (Id., pp.599-600.) After W.F. was intubated, Stanfield's "story just kind of kept getting cut off and changing." (Id., pp.601, 619-20.)

Freeborn noticed W.F. had red marks on his chest, "bruising in multiple stages" on his arm, abdomen, and legs that was "more than usual bruising for a child his age." (Id., p.602.) He also had "red marks over the top of his shoulders on his back" that "appeared to be handprints" "as if he was grabbed from behind." (Id., p.603.) Based upon Stanfield's

"lack of communication, the stories changing, the fact that -- and there are certain things I look for when I do get on scene. And the child -- there seemed to be a delay in contacting EMS or calling 911" (Stanfield told Freeborn that W.F. fell in the kitchen "30 minutes prior to [their] arrival"), Freeborn had her partner, Rene Miller contact police. (Id., pp.603, 620-21.) Miller confirmed most of her partner's observations. (Id., pp.433-34.)

W.F. was transported to St. Luke's emergency room (id., p.442), where Dr. Robert Hilvers had already been advised of W.F.'s transport and condition, and as a result, had contacted Dr. Paul Jansen, a pediatric critical care doctor, and made arrangements for a CT (State's Lodging A-5, pp.2157-58). When W.F. arrived, Dr. Hilvers had "a bit of a visceral response" based upon W.F. having been intubated, the "significant bruising, not only across the face, but just extremities," lack of "any neurologic response," and "extensive bilateral retinal hemorrhages," that all indicated "something acute and catastrophic had occurred." (Id., pp.2158-59.) "The most notable bruise [was on the right forehead] just because it was fairly large. It was 2 to 3 centimeters, and it was a little raised and very ecchymotic, meaning black and blue." (Id., p.2161.) W.F.'s pupils were "fixed and dilated," indicating "a significant intracranial injury, and often associated with increased pressure in the brain that has actually caused enough pressure that you've -- has a palsy of one of the cranial nerves." (Id., pp.2162-63.) While a CT scan revealed "bilateral subdural hematomas," it "did not explain any of the extent of this kid's neurologic impairment," which meant "this isn't something that had been going on for a long period of time." (Id., 2164.) Nevertheless, the doctors were concerned about "brain stem injury." (Id., p.2165.)

Dr. Jansen confirmed that W.F. pupils were "fixed and dilated," was not breathing on his own or responding to pain or touch, had a "very poor neurological exam, and

especially the brain stem. There was minimal brain stem function at that time." (State's Lodging A-4, p.1075.) W.F.'s fixed and dilated pupils "represent[ed] more of an advanced state of brain injury, that something bad has happened to the brain stem." (Id., p.1078.) Likewise, lack of pain response, which was part of the neurological exam, was "another sign of severe brain injury." (Id., p.1080.) W.F. also had "extensive areas of retinal hemorrhage in the back of his eye[s]." (Id., p.1083-84.) Dr. Jansen explained that the CT results showed no brain swelling, but some bleeding in the frontal part of the brain, which did not correspond with W.F.'s physical condition, causing Dr. Jansen to conclude "that something was evolving, something had happened more recently. Because this was a very, very bad exam, and yet his scan did not show that evidence." (Id., pp.1089-90.) W.F.'s condition worsened with lower blood pressure, problems with temperature regulation, excessive amounts of urine, and signs that his brain was not working because of his "corneal reflex going away" and his sensor posturing, which were signs W.F.'s brain was "not functioning as it should." (Id., pp.1097-98.)

The next morning, a second CT was ordered, which was "more in line with [W.F.'s] initial presentation at the hospital," because "[he] had a lot of swelling and not much blood flow to his brain." (Id., p.1100.) As time progressed, Dr. Jansen continued to have concerns about W.F.'s survivability because of brain and brain stem injury, resulting in him talking to Lance and conducting a "brain death examination" with Dr. Bruce Cherny, a pediatric neurosurgeon. (Id., pp.1104-07.) Shortly after midnight on December 13, pursuant to Lance's decision, W.F. was taken off life support and passed away. (Id., pp.1104-05.) Based upon "cumulative signs" that included "bruising, the extensive retinal hemorrhages, the bleeding in his head, the subdural hemorrhages, the progressive brain

swelling, … just horrible neurological exam with minimal brain stem function," Dr. Jansen opined that W.F. died from "abusive head trauma." (Id., p.1125.) He further opined this constellation of injuries could not be caused by W.F. falling over and hitting he head on a carpeted surface or becoming angry and throwing himself to the ground and striking his head on a carpeted surface. (Id., p.1126.)

Dr. Cherny characterized W.F.'s brain injury as "severe." (Id., p.1195.) He also explained that "[r]etinal hemorrhages are most commonly associated with abusive head trauma," [a]s opposed to accidental trauma or other forms of trauma." (Id., pp.1196-98; *see also* id., p.1201.) He confirmed that "fixed and dilated pupils are something that come from the brain stem." (Id., p.1202.) He also discussed his treatment of W.F. who, when first seen on December 12, was "in a very deep coma" and "showed very little signs of neurologic function"; the exam was consistent "with very little brain stem function." (Id. pp.1205-06.) He confirmed that W.F. had "extensive bleeding in the retina of the eye" that is associated with abusive head trauma, and was "large enough, extensive enough, and thick enough to be able to be seen on CT. So that would tell you that they're extraordinarily extensive and widespread." (Id., pp.1215-17.) He confirmed the first CT showed "bleeding inside the skull" "that was new, relatively acute, fresh," "located over the top of the head on both sides" some of which "had tracked in between the two sides of the brain, between the two hemispheres of the brain." (Id., p.1207.) While the brain "looked relatively normal" because there were no signs of swelling or skull fractures, the scan did not match what Dr. Cherny saw on physical exam or from the neurological testing. (Id.)

The second CT "looked dramatically different from the first" because it showed "the brain had lost all normal definition. It was extremely swollen," and "was quite black

and looked as if it was either dead or had completely stroked," all of which was "much more aligned with the way [W.F.'s] exam looked when he first presented." (Id., pp.1218-19.) This suggested "the problem and the injury or whatever brought him to the hospital occurred fairly close to the time that he was brought into the hospital." (Id., p.1220.) Dr. Cherny opined that this constellation of injuries was consistent with abusive head trauma, and not consistent with W.F. falling and hitting his head on a carpeted surface or throwing himself to the ground and hitting his head on a carpeted surface. (Id., pp.1224, 1227-29.)

Dr. Jon Fishburn, an ophthalmologist, was also contacted by Dr. Jansen to examine W.F.'s eyes while W.F. was on life support. (Id., pp.762, 765-66.) He found W.F.'s pupils "very dilated," "would not react to light on direct stimulation," and had "no reflex movement," meaning there was "no sensory input to the brain to reflexively blink the eyelids closed." (Id., p.770.) He also found each eye "had extensive disorganization of the intraocular contents, including … elevation of the retina, various levels of hemorrhage through the retina on each eye," which "shows severe trauma" and "would be a significant form of nonaccidental trauma." (Id., pp.773, 776.) Dr. Fishburn had never "seen this extensive of a retinal hemorrhaging that was [ ] multilayered" "from a little boy who ha[d] fallen from [ ] 34-1/2 inches" (id., p.791), and "certainly could be" "a finding of shaken baby syndrome" (id., p.789).

Pediatrician Michael Sexton, who had a "subspecialty certification as a child abuse pediatrician," was also contacted by Dr. Jansen. (State's Lodging A-5, pp.2732-33, 2767.) Dr. Sexton spoke with Stanfield and found her discussion of W.F.'s prior behavior and physical abilities inconsistent with records from W.F.'s treating physician, Dr. Scott Schwendiman. (Id., pp.2771-75.) Dr. Sexton also concluded the physical findings were

inconsistent with Stanfield's story regarding the events that allegedly resulted in W.F.'s injuries. (Id., pp.2778-79.) He also saw the retinal hemorrhages that were "bilateral multilayered that extended to the ora serrata that he would not expect in a little child falling over and hitting his head on the floor." (Id., pp.2780-81.) He discussed the multiple bruises that were of particular concern and explained those inside W.F.'s knees were in "an unusual location" because they were symmetric on both sides. (Id., pp.2781-83.) Dr. Sexton examined both CTs and concluded the second was "distinctly abnormal" because "the brain had lost its normal configuration. There was evidence of swelling in the brain that was causing the brain's normal indentations to even out, as well as losing the ability to tell the layers of the brain." (Id., pp.2784-85.) Based upon a "high degree of medical certainty," Dr. Sexton opined that W.F. "was the victim of physical abuse" having "suffer[ed] abusive head trauma." (Id., pp.2796-97.)

Dr. Don Bell, a radiologist, reviewed the two CT scans and agreed with Drs. Jansen, Cherney, and Sexton that there was a "catastrophic change" in the second scan based upon "diffuse edema and marked increase in intracranial pressure and herniation." (State's Lodging A-4, p.886.) Dr. Bell would not expect to see "this degree of brain injury from a child falling to the ground" or "from a little toddler angry and throwing himself backwards and hitting himself on the ground." (Id., p.893.) Rather, this was the result of "a violent force that caused this degree of injury with acceleration-deceleration, and rotation, perhaps, of the brain to get something this bad." (Id., pp.893-94.) Based upon the changes in the second scan, he opined the injury occurred a "couple of hours" before the first scan. (Id., pp.901-02.) Dr. Bell saw the retinal hemorrhages, which he did not typically see in CT scans and were "amongst the largest [he had] seen in [his] years of practice." (Id., p.890.)

Dr. Charles Garrison, a forensic pathologist with training in child abuse, conducted the autopsy on W.F.'s body. (State's Lodging A-4, pp.1622, 1635-36, 1674.) He removed W.F.'s eyes and sent them to Dr. J. Brooks Crawford, a forensic ophthalmologist. (Id., p.1686.) Dr. Garrison did not see contusions or laceration on W.F.'s brain with "the naked eye," which is why he later sent the brain and spinal cord to Dr. Lucy Rorke-Adams, a neuropathologist. (Id., pp.1688, 1822-23, 1838-39.) W.F. had external and internal signs of injury, a majority of which were "acute" or "recent," including the head injury, some of the bruises, and an abdominal injury. (Id., pp.1691-94.) Dr. Garrison opined the subdural hematoma was caused by blunt force trauma at the time W.F. "went down," meaning just before Stanfield called 911. (Id., pp.1702-04.) He also discussed the retinal hemorrhages that were "associated with abusive head trauma as opposed to accidental injury." (Id., pp.1707-08.) Dr. Garrison elaborated on the abdominal injury that had a "fresh hemorrhage" as well as an older injury in the same area, which were "very significant" injuries in a 2½-year old, and was caused by blunt force trauma, not a fall onto a carpeted area or CPR. (Id., pp.1719-28.) W.F. had bruising under his lip caused by an impact from his teeth that resulted from a "hard slap, punch, whatever you to call it, impact injury." (Id., pp.1728-31.) Dr. Garrison also discussed the bruising on W.F.'s body, many of which raised "red flags," especially the bruising on the buttocks and legs. (Id., pp.1731-51.) Ultimately, Dr. Garrison opined that W.F. was "[a]n abused child" (id., p.1751), who died from "blunt force trauma to the head secondary to the actions of another person," which means "someone else was responsible for the blunt force trauma to the head," and that the manner of death was "homicide" (id., pp.1690-91).

Dr. Crawford examined W.F.'s eyes (id., p.947) and found hemorrhages "all the way from the optic nerve here clear out to the periphery where the retina ends. That's called the 'ora serrata.'" (Id., p.957.) He had "never seen that … [in] any kind of accidental trauma." (Id.) The damage was caused by "acceleration and deceleration forces, and not just one. It takes considerable force, repetitive forces." (Id.) The damage involved "every retinal layer" and was "massive. They were all over" (id., p.961), and it involved a "massive amount of subretinal hemorrhage," which Dr. Crawford had never seen before (id., p.992). Ultimately, Dr. Crawford opined that his findings were consistent with abusive head trauma, and with 99.9% certainty, opined that it involved "acceleration -- repetitive acceleration-deceleration forces." (Id., pp.995-96.)

On September 21, 2010, an Indictment was filed charging Stanfield with W.F.'s first-degree murder. (State's Lodging A-1, pp.17-18.) After Stanfield was indicted, the state retained Dr. Rorke-Adams, who reviewed the medical report, autopsy reports, and tissue samples she had reviewed. (Id., pp.1992-93.) When she began explaining that her technician prepared some slides with beta amyloid staining, Stanfield objected based upon hearsay and the Confrontation Clause because Dr. Rorke-Adams did not prepare the slides. (Id., pp.1995-98.) After requiring the state to lay additional foundation, Stanfield's objection was overruled, Dr. Rorke-Adams discussed the findings from her report, and the findings from the slides prepared by the technician. (Id., pp.1995-2034.)

During trial, it was revealed that Stanfield gave multiple stories surrounding the events on the morning of W.F.'s fatal injury. Detective Mark Vucinich interviewed her several times and agreed that "the details, for instance, of what happened, where she was, those sorts of things, change[d] during the various interviews." (Id., p.1388.) Detective

Vucinich explained that one of the reasons he focused upon Stanfield was because her statements were inconsistent with what C.D. had stated and inconsistent with the medical evidence. (State's Lodging A-5, p.3511.) During a reenactment, Stanfield's explanation of what happened to W.F. changed again. (Id., pp.3534-35.) Officer James Adams agreed that when he interviewed Stanfield after W.F. was transported to the hospital that she gave "inconsistent details or versions of events." (State's Lodging A-4, p.730, *see also* p.742.)

Stanfield testified that after returning from a shopping trip that morning with W.F. and J.D, she asked W.F. to take off his shoes and coat so he could use the bathroom, and "as he was stepping up the stair, he had his shoes off and his pants were too long, and he tripped and fell and hit his forehead." (State's Lodging A-6, p.4165.) She then changed W.F.'s clothes because he had blood on his shirt from his lips because they would crack and bleed. (Id., pp.4169-70.) Stanfield did not see any bruises when she changed his shirt. (Id., p.4171.) After that first alleged fall, W.F. had lunch and "was fine." (Id., p.4172.)

Sometime after 3:15, after picking up C.D. from school, Stanfield and the three boys returned to the daycare. (Id., pp.4182-86.) While standing in the dining room preparing a snack, Stanfield asked C.D. to have W.F. remove his coat so they could have a snack even though Stacie was due to pick up W.F. in about 15 minutes. (Id., pp.4190-92.) Stanfield turned to go in the kitchen "and that's when [she] heard [W.F.] fall." She initially said she was not looking at him when he fell, but changed her testimony and said she "would have seen him side view sort of. (Id., pp.4192-93.) C.D. and J.D. were sitting on the floor playing with toys; she did not remember C.D. "ever leaving the room to go to the bathroom." (Id., p.4193.) When W.F. allegedly fell, Stanfield turned and said, "[W.F.], get up" because she though he was upset the two other boys were touching new toys that

had been purchased that morning. (Id., p.4196.) After she called W.F. again and he didn't get up, she "run [sic] over to him." (Id., pp.4197.) "He was laying there, and he was breathing really like big breaths. His eyes were wide open. I picked him up around his little ribs and tried to stand him up, and he was just limp." (Id.) The two other boys were still sitting on the floor, C.D started to "giggle," and Stanfield said, "this isn't funny." (Id., p.4198.) Stanfield then laid W.F. on the floor and started CPR. (Id., p.4199.) At 3:32 p.m., she called Stacie instead of 911 "because when you get on with 911, you can't get off," but Stacie didn't answer. (Id., p.4200.) She called Stacie again and told her "[s]omething is wrong with [W.F.]. Please hurry." (Id., p.4201.) She then called 911 even though she did not believe W.F.'s situation was "serious." (Id., pp.4202, 4207.)

Stanfield denied telling officers she saw W.F. "[throw] himself back when he was mad and he hit the side of his head," even though the conversation was recorded. (Id., pp.4252-53.) Rather, Stanfield contended that she was "[s]tanding by [the] dining room table, heard [a] thud, and looked over" and saw W.F. fall "straight back." (Id., p.4251.) She thought W.F. "hit the back of his head. He was laying flat when [she] went to him." (Id., p.4253.) She also "thought he lost his breath and fell back," because she could not recall whether he threw himself back. (Id., p.4256.) Stanfield was then impeached with some of the numerous stories she had told other people regarding W.F.'s alleged "fall," and disagreed with C.D.'s testimony of what occurred. (Id., pp.4257-59.) Nevertheless, Stanfield denied jerking, grabbing, shaking, bruising, or having anything to do with W.F.'s death. (Id., pp.4247-49.)

After learning she was going to be arrested, Stanfield instructed Lance to "take [his] time" getting to an interview with Detective Vucinich, and that she was going to a hotel to

avoid being arrested. (State's Lodging A-5, pp.2960-61.) She even parked her car behind the hotel so "nobody could find her." (Id., p.2960.) Stanfield confirmed she went to the hotel because she was "scared that [Vucinich] had told [her she] was facing first degree murder." (State's Lodging A-6, p.4239.)

Stanfield was found guilty of W.F.'s first-degree murder (id., p.671), and given a unified life sentence with a fixed portion of ten years. (Id., pp.726-79.) The Idaho Supreme Court affirmed. (State's Lodging B-4.)

With the assistance of new counsel, Stanfield filed a Petition for Post-Conviction Relief (State's Lodging C-1, pp.6-22) and an amended petition that included a claim that trial counsel was ineffective by affirmatively waiving all included offenses (id., pp.105-20). The post-conviction court granted the state's Motion for Summary Disposition. (Id., pp.139-67, 306-24.) Because of Idaho's "acquittal first rule," the Idaho Supreme Court affirmed the dismissal of Stanfield's claim regarding trial counsels' waiver of included offenses but reversed on three of her other ineffective assistance of counsel ("IAC") claims and ordered an evidentiary hearing. (State's Lodging D-6.)

On remand, after the evidentiary hearing (State's Lodging E-2, pp.99-349), the post-conviction court entered Findings of Fact and Conclusions of Law and dismissed the remaining claims (State's Lodging E-1, pp.239-75). Although Stanfield filed a Notice of Appeal (id., pp.278-82), her attorney moved to withdraw because there were no "non-frivolous" issues that could be raised on appeal (State's Lodgings F-1, F-2). The Idaho Supreme Court granted counsel's motion and ordered Stanfield to obtain new counsel or file an opening brief. (State's Lodging F-4.) When the opening brief was not filed, the court dismissed her appeal. (State's Lodging F-6.)

With the assistance of counsel, Stanfield filed her Petition raising three claims. (State's Lodging Dkt. 1.)

III.

**EXHAUSTION OF STATE REMEDIES**

Stanfield has exhausted state remedies in the sense that there are no available state procedures that exist for the proper presentation of any claims in her Petition which may not have been previously submitted to the Idaho Supreme Court.

IV.

**SPECIFIC ANSWERS AND MERITS BRIEFING REGARDING PETITIONER'S CLAIMS**

A.    Standards Of Law Regarding Habeas Claims And AEDPA

"A state prisoner may request that a federal court order his release by petitioning for a writ of habeas corpus." Shinn v. Ramirez, 142 S.Ct. 1718, 1730 (2022) (citing 28 U.S.C. § 2254.)  However, under 28 U.S.C. § 2241(c), a petition for habeas corpus will be granted only if the petitioner alleges and proves facts showing he is in custody in violation of the Constitution, laws or treaties of the United States. Id. (citing § 2254(a)); *see also* 28 U.S.C. § 2241(3).  "The writ of habeas corpus is an 'extraordinary remedy' that guards only against 'extreme malfunctions in the state criminal justice systems.'" Ramirez, 142 S.Ct. at 1731.  The Supreme Court has recently discussed the history and limitations associated with the writ of habeas corpus. *See* Brown v. Davenport, 142 S.Ct. 1510, 1520-1524 (2022) (quoting 28 U.S.C. §§ 2241, 2243).  The Court recognized, "Congress invested federal courts with discretion when it comes to supplying habeas relief – providing that they 'may' (not must) grant writs of habeas corpus, and that they should do so only as 'law and justice require.'" Id. at 1523.  Even after passage of AEDPA, "a petitioner who prevails

under AEDPA must still today persuade a federal habeas court that 'law and justice require' relief." Id. at 1524 (quoting 28 U.S.C. § 2243); *see also* Ramirez, 142 S.Ct. at 1731.

Habeas relief is further restricted by AEDPA, Shoop v. Twyford, 142 S.Ct. 2037, 2043 (2022), which permits relief only if the state courts' adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also* Twyford 142 S.Ct. at 2045.

1.      The Contrary To And Unreasonable Application Clauses

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meaning. Bell v. Cone, 535 U.S. 685, 694 (2002). A state court's decision is contrary to clearly established federal law, as determined by the United States Supreme Court, if it (1) "applies a rule that contradicts the governing law set forth in our cases," or (2) "confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a result different from our precedent." Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

A state court's decision is an unreasonable application of clearly established federal law, as determined by the Supreme Court, if "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." Id. at

410 (emphasis in original). Stanfield must establish the state courts' application of clearly established federal law, as determined by the United States Supreme Court, was "objectively unreasonable." <u>Wildman v. Johnson</u>, 261 F.3d 832, 837 (9th Cir. 2001). And "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011).

The standard "is difficult to meet," granting authority to issue the writ only in cases "where there is no possibility fair-minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedent." <u>Harrington v. Richter</u>, 562 U.S. 86, 102 (2011). Stanfield "must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." <u>Id.</u> "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> This does not require citation of Supreme Court cases by the state court or even awareness of such cases, "so long as neither the reasoning nor the result of the state-court decisions contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated." <u>Richter</u>, 562 U.S. at 99. Indeed, the Supreme Court has reasoned, "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id.</u> This principle has been extended to

situations where a state court "addresses some but not all of a defendant's claims." <u>Johnson v. Williams</u>, 568 U.S. 298, 298 (2013). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).

2.    Determination Of The Facts And State Court Findings

Factual findings fall within two AEDPA provisions, §§ 2254(d)(2) and 2254(e)(1). <u>Lambert v. Blodgett</u>, 393 F.3d 943, 971 (9th Cir. 2004). Understanding how §§ 2254(d)(2) and (e)(1) interact has yet to be resolved by the Supreme Court, <u>Burt v. Titlow</u>, 571 U.S. 12, 18 (2013), or the Ninth Circuit, <u>Murray v. Schriro</u>, 745 F.3d 989, 1001 (9th Cir. 2014).[2] Irrespective of apparent tension between §§ 2254(d)(2) and (e)(1), the Supreme Court has determined "'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" <u>Titlow</u>, 571 U.S. at 18 (quoting <u>Woods v. Allen</u>, 558 U.S. 290, 293 (2010)); *see also* <u>Pizzuto v. Yordy</u>, 947 F.3d 510, 523 (9th Cir. 2019). Moreover, "review of factual determinations under §2254(d)(2) is expressly limited to the evidence presented in the State court proceeding." <u>Twyford</u>, 142 S.Ct. at 2043 (quotes omitted).

Addressing § 2254(d)(2), the Supreme Court has explained, "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence

---

[2] Other circuits have also declined to "delve into the relationship between subsections (d)(2) and (e)(1)." <u>Robidoux v. O'Brian</u>, 643 F.3d 334, 338 n.3 (1st Cir. 2011); *see also* <u>Landers</u>, 776 F.3d at 1293 n.4.

presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). The Court has further held "'that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" <u>Titlow</u>, 571 U.S. at 18 (quoting <u>Wood</u>, 558 U.S. at 293). Rather, § 2254(d)(2) requires that state courts be accorded "substantial deference. If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's determination." <u>Wood</u>, 559 U.S. at 301 (quotes, citations, brackets, ellipsis omitted).

In <u>Hibbler v. Benedetti</u>, 693 F.3d 1140, 1146 (9th Cir. 2012) (citation omitted), the Ninth Circuit opined that § 2254(d)(2) challenges fall into two categories. "First, a petitioner may challenge the substance of the state court findings and attempt to show that those findings were not supported by substantial and competent evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." The court explained, "Regardless of the type of challenge, the question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable–a substantially higher threshold." <u>Id.</u> (quotation and citation omitted).

Addressing the substance of a state court finding, the court reasoned, "it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record," <u>id.</u> (quotes and citations omitted), which "is a daunting standard–one that will be satisfied in relatively few cases," <u>Maxwell v. Roe</u>, 628 F.3d 486, 500 (9th Cir. 2010).

The Supreme Court has recognized this standard "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court," which "was meant to be" because "AEDPA requires a state prisoner to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement." Titlow, 571 U.S. at 19-20 (quotes, citations, ellipsis, brackets omitted). A petitioner must show "that the trial court had no permissible alternative but to" reach the opposite conclusion. Rice v. Collins, 546 U.S. 333, 341-42 (2006). The question is not whether the federal court would make a different factual finding, but whether the state court's finding is supported by the record. Rodriguez v. McDonald, 872 F.3d 908, 919 (9th Cir. 2017). "[I]f permissible inferences could be drawn either way, the state court decision must stand, as its determination of the fact would not be unreasonable." Hunterson v. Disabato, 308 F.3d 236, 250 (3rd Cir. 2002). Even when a state court makes a credibility finding without an evidentiary hearing, that finding is entitled to deference under §2254(d)(2). Landers v. Warden, 776 F.3d 1288, 1297 (11th Cir. 2015).

Addressing the state court's procedures, the Ninth Circuit concluded, "[M]ere doubt as to the adequacy of the state court's findings of fact is insufficient; we must be satisfied that any appellate court to whom the defect in the state court's fact-finding process is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quotes and citations omitted). More importantly, even when a state court makes a credibility finding without an evidentiary hearing, that finding is entitled to deference under § 2254(d)(2). Landers v. Warden, 776 F.3d 1288, 1297 (11th Cir. 2015); see also Oliver v. Davis, 25 4.th 1228, 1236 (9th Cir.

2022) (quotes and citation omitted) ("Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination.").

Section 2254(d)(2) is even more "'daunting'" and will be "'satisfied in relatively few cases,'" "because an 'unreasonable determination of the facts' does not, itself, necessitate relief." Byrd v. Workman, 645 F.3d 1159, 1172 (10th Cir. 2011) (quoting Taylor v. Maddox, 366 F.992, 1001 (9th Cir. 2004), *overruled on other grounds by* Murray, 745 F.3d at 999-1000). "Rather, in order to receive relief under this clause, the petitioner must show that the state court's adjudication of the claims 'resulted in a decision that was *based on* an unreasonable determination of the facts in light of the evidence presented.'" Id. (quoting § 2254(d)(2)) (emphasis in original); *see also* Rice v. White, 660 F.3d 242, 242, 250 (6th Cir. 2011) (quotes and citation omitted).

Recently, the Ninth Circuit explained that, irrespective of whether a claim is governed by § 2254(d)(2), "§ 2254(e)(1)'s application is not limited to claims adjudicated on the merits. Rather, it appears to apply to **all factual determinations** made by state courts. Thus, we defer to the [Idaho courts'] factual determinations unless [Stanfield] provides clear and convincing evidence that its factual findings were wrong." Kirkpatrick v. Chappell, 926 F.3d 1157, 1170 (9th Cir. 2019) (emphasis added). Importantly, the Ninth Circuit recognized it was "not tasked with determining whether Kirkpatrick was competent to waive his state habeas exhaustion petition and whether his waiver was voluntary, knowing and intelligent. We are tasked only with deciding whether Kirkpatrick has presented clear and convincing evidence to rebut the California Supreme Court's finding that Kirkpatrick validly waived his habeas exhaustion petition." Id. at 1172.

"Clear and convincing evidence requires greater proof than preponderance of the evidence. To meet this higher standard, a party must present sufficient evidence to produce 'in the ultimate factfinder an abiding conviction that the truth of its factual contentions are [sic] highly probable.'" Sophanthavong v. Palmateer, 378 F.3d 859, 866 (9th Cir. 2004) (alteration in original) (quoting Colorado v. New Mexico, 467 U.S. 310, 316 (1984)). Even "[w]here the record is ambiguous, a state appellate court's factual findings are deemed to be fairly supported by the record." Palmer v. Estelle, 985 F.2d 456, 459 (9th Cir. 1993) (citation and quotation omitted); *see also* Williams v. Rhoades, 354 F.3d 1101, 1108 (9th Cir. 2004) (applying Palmer to AEDPA case). As explained in Watkins v. Rubenstein, 802 F.3d 637, 651 (4th Cir. 2015) (Traxler, C. J., concurring), even if a federal court would have initially made a different finding than the state court, it is the federal court's "obligation [] to give deference to the state court's reasonable adjudication of the constitutional claim in light of the evidence presented to it, and to give the state court the benefit of the doubt when doing so." "In the end, however, [this Court's] interpretation of the state court's explicit finding of fact is irrelevant, for [this Court is] not at liberty to pick it apart or rewrite it in the light most favorable to [Stanfield]." Id. at 652 (citing Palmer, 985 F.2d at 459).

3.    Claims Which Are Reviewed *De Novo*

"[W]hen it is clear that a state court has not reached the merits of a properly raised issue, [this Court] must review it *de novo*." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). "[D]etermining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." Richter, 562 U.S. at 99.

However, as explained above, even if a claim must be reviewed *de novo*, "factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence." Pirtle, 313 F.3d at 1168 (citing Appel v. Horn, 250 F.3d 203, 210 (3rd Cir. 2001)); *see also* Rodriguez, 872 F.3d at 918 (citing Crittenden v. Chapell, 804 F.3d 998, 1011 (9th Cir. 2015)) (even under *de novo* review "the state court's factual findings are entitled to a presumption of correctness that can be overcome only by clear and convincing evidence"). This presumption applies to "express and implied factual determinations by the state trial court and [Idaho] Supreme Court." Cooper v. Brown, 510 F.3d 870, 919 (9th Cir. 2007). As explained by the Ninth Circuit:

> The presumption of correctness applies not only to express findings of fact, but also applies equally to unarticulated findings that are necessary to the state court's conclusions of mixed questions of fact and law. Where there are two permissible views of the evidence, a fact finder's choice between them cannot be clearly erroneous.

Id. (citations omitted).

B.  Under AEDPA And *De Novo* Review, Stanfield Has Failed To Establish She Is Entitled To Habeas Relief On Any Of Her Claims

1.  Claim 1: There Was No Confrontation Clause Violation Stemming From Dr. Rorke-Adams' Testimony

a.  Introduction

In Claim 1, Stanfield raises a Confrontation Clause claim contending her Sixth Amendment rights were violated because Dr. Rorke-Adams "based her testimony, in part, on her review of tissue slides prepared by a lab technician," "did not prepare those slides," and Stanfield "did not have an opportunity to cross-exam the lab technician." (Dkt. 1, p.5.) Because there is no clearly established Supreme Court precedent that controls her claim, it fails under 28 U.S.C. § 2254(d)(1). It also fails because she has not met her burden of

establishing the Idaho Supreme Court's decision was contrary to, or involved an unreasonable application of, Supreme Court precedent, or was based upon an unreasonable determination of facts. Even under *de novo* review her claim fails. Finally, any alleged error is barred by the new rule doctrine and is harmless.

b.     <u>Relevant Facts And Testimony From The Trial</u>

Dr. Rorke-Adams' first contact with the case was by the prosecutor in August 2011. (State's Lodging A-5, p.2076.) She also had telephonic conferences with Dr. Garrison. (Id., p.2077.) In addition to receiving W.F.'s medical records, the autopsy report, tissue samples from the autopsy, Dr. Crawford's report, and other reports, Dr. Rorke-Adams received "actual remnants of the brain tissue … so [she] could look directly at the brain and spinal cord and some of the tissue coverings" that were in paraffin blocks. (Id., pp.1992-95.) A lab technician prepared some additional slides that involved amyloid staining when Dr. Rorke-Adams was not present. (Id., pp.1995-96.) When asked what the staining entailed, Stanfield objected. (Id.) Upon further questioning Dr. Rorke-Adams described the "routine procedure in every case" that involves "cut[ting] the tissue into small pieces so that the technician can prepare the slides" who then prepares the tissue "according to whatever technique we ask for the preparation." (Id., pp.1996-97.) She then explained that when the tissues arrived in her office, they were already labeled identifying to whom they belonged, they remained labeled, and she could tell the tissues came from W.F. (Id., p.1998.) The only document provided by the technician was that "she received the tissue, the stain that we requested her to do, and she notes when she did it, and when she handed it back to us." (Id., pp.1998-99.) Dr. Rorke-Adams further explained that she filled out a request sheet that asked for a specific antibody to be applied to the tissue that was given to

the technician with the tissue, and then how she was able to determine that the stain was properly applied "[b]ecause there's always a control slide that goes with it." (Id., pp.2000-02.) She looked at the control slide first to make sure "the technique was working so that [she] can rely then upon what [she's] looking at in the unknown slide." (Id, p.2002.).

After the trial court overruled Stanfield's objection, Dr. Rorke-Adams explained that, after reviewing all the material provided and examining the tissues both grossly and microscopically, she prepared a report detailing her findings. (Id., pp.2003-04.) Dr. Rorke-Adams then reviewed the contents of her report that included a discussion of the clinical history, five findings that she made based upon a "gross description" that is "basically a description of what the pathologist sees when examining the brain," a discussion of the two CTs, and "respiratory brain." (Id., pp.2004-22.)

Dr. Rorke-Adams then discussed how the amyloid staining that was completed by her lab technician "will help us recognize damage to axons" that "are the fibers that are a product of every single nerve cell that we have in our body, and they're the wires that I mentioned before that connect with the other nerve cells in the nervous system. So, in certain kinds of traumatic injury, there's damage to these axons." (Id., pp.2022-23.) "Axonal injury in certain areas tells us what forces may have been involved in producing the trauma to the brain," and "occurs right at the time of the trauma." (Id., pp.2024-26.) Axonal injury in the corpus callosum or brain stem "is classical for angular acceleration injury" and is "quite uncommon," but was found in W.F.'s spinal cord. (Id., pp.2032-34.)

Ultimately, Dr. Rorke-Adams made six diagnoses, only one of which involved any information derived from staining completed by her technician – "primary acute deep cerebral, cerebral brainstem and spinal cord contusions/laceration with axonal injury,

secondary to angular accelerations forces." (Id., pp.2056-58.) After further explaining her sixth diagnosis and opining W.F. "was subjected to severe angular acceleration forces and died as a consequence" (id., pp.2058-60), Dr. Rorke-Adams agreed that her findings confirmed the other doctors' findings of a brain stem injury. (Id., pp.2061-62.)

       c.      <u>Supreme Court Decisions Regarding The Confrontation Clause</u>

The Confrontation Clause of the Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Prior to Stanfield's trial, the Supreme Court abandoned its Confrontation Clause analysis from <u>Ohio v. Roberts</u>, 448 U.S. 46 (1980), and concluded the Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004). The primary evil at which the Clause is aimed is the government's gathering of *ex parte* evidence with the purpose of using that evidence later at trial. <u>Id.</u> at 50-52; *see also* <u>Michigan v. Bryant</u>, 562 U.S. 344, 354 (2011). As later explained in <u>Williams v. Illinois</u>, 567 U.S. 50, 82 (2012) (plurality), the abuses identified as prompting the adoption of the Confrontation Clause include the following characteristics: "(a) they involved out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they involved formalized statements such as affidavits, depositions, prior testimony, or confessions." As reasoned by the Court, "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." <u>Davis v. Washington</u>, 547 U.S. 813, 821 (2006). The Court concluded:

Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Crawford, 541 U.S. at 51-52 (quotes, ellipsis, and citations omitted).

In Davis, 547 U.S. at 823, which involved a police interrogation, the Court was again unwilling to produce an exhaustive list of all conceivable "testimonial statements," but ultimately concluded, "They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  In further explaining "testimonial statements," the Court subsequently reasoned, "Statements to friends and neighbors about abuse and intimidation, and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules."  Giles v. California, 554 U.S. 353, 376 (2008).

In Bryant, 562 U.S. at 358 (quotes omitted), the Court explained that when "the primary purpose of an interrogation is to respond to an ongoing emergency, its purpose is not to create a record for trial and thus is not within the scope of the Clause."  However, the Court recognized "there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony."  Id. (emphasis in original).  Addressing the "primary purpose determination," the Court explained that "standard rules of hearsay, designed to identify some statements as reliable will be relevant.  When no such primary purpose exists, the

admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Id. at 358-59 (footnote omitted).

Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009) (quotes and citations omitted), involved documents admitted at trial that were prepared by an analyst who did not testify, and were "declarations of facts written down and sworn to by the declarant before an official authorized to administer oaths" regarding the weight and substance of the contents of plastic bags. The Court concluded the documents were testimonial because they were "quite plainly affidavits" that were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" particularly since "under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality and the net weight of the analyzed substance." Id. (quotes and citations omitted).

In Bullcoming v. New Mexico, 564 U.S. 647, 651 (2011), the Court addressed a similar question, "whether the Confrontation Clause permits the prosecution to introduce a forensic laboratory report containing a testimonial certification–made for the purpose of proving a particular fact–through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Concluding the laboratory report was testimonial, the Court explained that "[i]n all material respects [it] resembles those in *Melendez-Diaz*" because "a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," the analyst "tested the evidence and prepared a certificate concerning the results of her analysis," the "certificate [was] 'formalized' in a signed document headed a 'report,'" and the report form

"contains a legend referring to municipal and magistrate courts' rules that provide for the admission of certified blood-alcohol analyses." Id. at 665 (quotes and citations omitted).

Importantly, Justice Sotomayor explained, "this is not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence" and "[w]e would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence." Id. at 673 (Sotomayer, J., concurring).

In Williams, 567 U.S. at 84, a plurality of the Court applied some of these general principles to conclude a DNA report that "was not prepared for the primary purpose of accusing a targeted individual" did not violate the Confrontation Clause. The Court reasoned that such reports provide "no prospect of fabrication and no incentives to produce anything other than a scientifically sound and reliable profile." Id. at 85 (quotes and citation omitted). The Court further noted it was "significant that in many labs, numerous technicians work on each DNA profile" and "[w]hen the work of a lab is divided up in such a way, it is likely that the sole purpose of each technician is simply to perform his or her task in accordance with accepted procedures." Id.

Concurring with the plurality, Justice Breyer expressly noted that barring admission of the DNA report could "bar the admission of other reliable case-specific technical information such as, say, autopsy reports." Id. at 97 (Breyer, J., concurring). As explained by Justice Breyer:

> Autopsies, like the DNA report in this case, are often conducted when it is not yet clear whether there is a particular suspect or whether the facts found in the autopsy will ultimately prove relevant in a criminal trial. Autopsies are typically conducted soon after death. And when, say, a victim's body

has decomposed, repetition of the autopsy may not be possible. What is to happen if the medical examiner dies before trial? Is the Confrontation Clause effective to function as a statute of limitations for murder?

Id. at 97-98 (quotes and citations omitted).

Justice Thomas concurred in the judgment, explaining his conclusion was based upon the report lacking the "requisite formality and solemnity to be considered testimonial for purposes of the Confrontation Clause." Id. at 103-04 (Thomas, J., concurring).

The fractured nature of Williams, and five justices appearing to have disagreed with the plurality, led Justice Kagen to conclude that the "five Justices who control the outcome of today's case agree on very little" and have "left significant confusion in their wake." Id. at 141 (Kagan, J., dissenting). Justice Kagan continued:

> What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings is – to be frank – who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

Id.

> d.     The Idaho Supreme Court's Decision

The Idaho Supreme Court meticulously discussed the Supreme Court's Confrontation Clause jurisprudence, comparing the facts and legal principles in Crawford, Davis, Bryant, Melendez-Diaz, Bullcoming, and Williams. (State's Lodging B-4, pp.5-11.) The Idaho Supreme Court acknowledged the fractured nature of Williams, and explained that where "no single rationale commands the support of a majority, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" (Id., p.11) (quoting Marks v. U.S., 430 U.S. 188,

193 (1977)).  The court recognized, "Because no position received support from a majority

of the justices, *Williams* does not provide us a governing legal principle and this Court

views the decision as limited to the unique set of facts presented in that case."  (Id.)  The

court then reasoned that the facts in Stanfield's case

> differ from both *Melandez-Diaz*, which involved a certified report that was
> admitted without live testimony, and *Bullcoming*, which involved a signed
> report that was admitted through surrogate testimony of another analyst who
> had no connection to the report and offered not independent expertise.
> Indeed, the facts appear to fall within one of the scenarios identified by
> Justice Sotomayor as being outside the "limited reach" of the majority
> opinion in *Bullcoming*.

(Id., p.12) (citations omitted).

The court noted that "[c]ircuit courts and state courts have disagreed as to the proper

application of current Supreme Court Confrontation Clause jurisprudence," (id.) (citing

cases), and that "[t]he only consistent requirement that can be distilled from these decisions

is that in order for a statement–forensic or otherwise–to be deemed testimonial, it must

have been made with a primary objective of creating an evidentiary record to establish or

prove a fact at trial," (id).

The court then discussed State v. Kramer, 278 P.3d 431 (Idaho Ct. App. 2012),

concluded its 'inquiry should focus on whether the technician's statements were made with

a primary objective of creating an evidentiary record to establish or prove a fact at trial,"

and recognized that "[a] number of courts, presented with facts similar to those in *Kramer*,

have likewise held that the testimony of an expert witness who arrives at an independent

conclusion is permissible under the Confrontation Clause even where other non-testifying

analysts have provided underlying data or conducted portions of the testing."  (Id. at 12-

13) (citing cases in footnote 6).  The court joined "the majority of jurisdictions considering

this subject and focus[ed its] attention on the question whether the primary purpose of the lab technician's act of labeling the slides and the implicit assertion that the proper stain was applied was intended to establish some fact at trial and whether Dr. Rorke-Adams served as a mere conduit." (Id., pp.14-15.)

The court then discussed Dr. Rorke-Adam's testimony, (id., pp.15-16) and noted that, while she did not observe the technician prepare the slides, she was still able to determine if the correct stain had been applied (id., pp.15-16). The court found that "Dr. Rorke-Adams had personal knowledge that the slides were stained correctly based on her comparison of the slides with the control slide. Based upon this testimony, Dr. Rorke-Adams did not rely upon an implied assertion by the technician that the slide had been properly prepared." (Id., p.16.) The court ultimately concluded:

> [T]he labeling occurred during preliminary steps for Dr. Rorke–Adams' forensic examination. The technician did not make any conclusions or factual findings as to any issue to be decided at trial when she labeled the slides and the technician's assertion had no probative value as to Stanfield's guilt or innocence. Rather, the act of labeling was manifestly for a laboratory—rather than trial—purpose: to identify the samples while they awaited Dr. Rorke–Adams' examination. Further, while assertions need not be contained in formalized affidavits or admitted at trial to be testimonial, the fact that the technician did not prepare a report suggests that her purpose in labeling the slides was not to establish any fact at trial. The only testimony the technician could have supplied would be to attest that she did not alter the integrity or identity of the tissue samples. This is akin to the type of assertion made by any person whose name appears in a chain of custody. As the Supreme Court held in *Melendez–Diaz*, the right to confrontation does not mandate that the prosecution call every person involved in the chain of custody. (Citation omitted).

> Further, like the calibration certificates in *Kramer*, the technician's assertions were not admitted as direct proof of an element of the crime; rather, they were admitted as foundation for the introduction of the results of Dr. Rorke–Adams' testimony regarding her examination of the samples and the conclusions she drew therefrom, i.e., that W.F. died from non-accidental trauma. These findings and conclusions were derived from Dr. Rorke–Adams' personal examination and observations of the slides. Unlike

the analyst in [*State v.*] *Navarette*, [294 P.3d 435 (N.M. 2013),] the technician in this case made no independent conclusions and the labeling did not prove any fact relevant to Stanfield's guilt or innocence.

For these reasons, we hold that there was no Confrontation Clause violation because the technician's assertions were not made for an evidentiary purpose and thus were not testimonial.

(Id., pp.16-17.)

    e. <u>There Is No Clearly Established Supreme Court Precedent To Resolve Stanfield's Confrontation Clause Claim</u>

Based especially upon the fractured nature of <u>Williams</u>, and Justice Sotomayor's concurrence in <u>Bullcoming</u>, there is no clearly established Supreme Court precedent that resolves Stanfield's case. The Supreme Court has repeatedly explained that "clearly established law" under § 2254(d)(1), "signifies 'the holdings, as opposed to the dicta, of [the Supreme Court's] decisions.'" <u>Howes v. Fields</u>, 565 U.S. 499, 505 (2012) (quoting <u>Williams</u>, 529 U.S. at 412); *see also* <u>Richter</u>, 562 U.S. at 101 (quoting <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009)) ("'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'"); <u>Yarborough</u>, 541 U.S. at 661; <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73 (2003). The Supreme Court has even rejected the "unreasonable-refusal-to-extend concept," explaining that, "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not 'clearly established at the time of the state-court decision.'" <u>White v. Woodall</u>, 572 U.S. 415, 426 (2014) (quotes and citations omitted). As explained in <u>Carey v. Musladin</u>, 549 U.S. 70, 76 (2006), the fact that "lower courts have diverged widely" on the question presented "[r]eflect[s] the lack of guidance from this Court" and supports a finding of no clearly

established law as determined by the Supreme Court. And as explained by the Idaho Supreme Court, there is clearly a wide divergence on the question Stanfield presented to the state courts. (*See* State's Lodging B-4, p.13 n.6.)

Moreover, while circuit cases "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help us determine what law is 'clearly established,'" Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999), "the Supreme Court has been clear: 'circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA.'" Fauber v. Davis, 43 F.4th 987, 1007 (9th Cir. 2022) (quoting Parker v. Matthews, 567 U.S. 37, 48 (2012) (per curiam)). "When determining what is clearly established federal law, we are not permitted to frame Supreme Court precedents at a high level of generality; otherwise, we 'could transform even the most imaginative extension of existing case law into 'clearly established Federal law, as determined by the Supreme Court.'" Grim v. Fisher, 816 F.3d 296, 304-05 (5th Cir. 2016) (quoting Nevada v. Jackson, 569 U.S. 505, 512 (2013)); *see also* Fauber, 43 F.4th at 1007-08.

Because there is no clearly established Supreme Court precedent addressing the issue raised in Claim 1, the Idaho Supreme Court's opinion cannot be contrary to, or an unreasonable application of, Supreme Court precedent. In Flournoy v. Small, 681 F.3d 1000, 1004 (9th Cir. 2012), the court addressed the admissibility of an expert's testimony based on tests and reports of other crime lab employees. After examining Supreme Court precedent, the court concluded, "there does not appear to be clearly established federal law that would make the admission of Rogala's testimony unreasonable under the standard set

under AEDPA." Id. at 1004-05; *see also* Grim v. Fisher, 816 F.3d 296, 298-99, 309 (5th Cir. 2016) (there is no clearly established Supreme Court precent barring admission of a "forensic report containing a testimonial certification of an analyst – made for the purpose of proving a particular fact – through the testimony of a technical reviewer who verified the analyst's findings, agreed with a reasonable degree of scientific certainty with the analyst's examinations and the results of the analyst's report, and signed the certification").

Likewise, in Meras v. Sisto, 676 F.3d 1184, 1187-90 (9th Cir. 2012), the court concluded there was no clearly established Supreme Court precedent on the question of the admissibility of a supervising expert testifying regarding DNA analysis performed by a different expert. *See also* Peters v. Arnold, 765 Fed. Appx 389, 390 (9th Cir. 2019) (unpublished) ("[T]he fractured decision in *Williams* [ ], did not clearly establish any Confrontation Clause principle relevant here."); Barba v. Montgomery, 723 Fed. Appx. 432, 432 (9th Cir. 2018) (unpublished) (noting the fractured decision in Williams, "and the lack of clarity in the Supreme Court's Confrontation Clause jurisprudence"); Jimenez v. Allbaugh, 702 Fed. Appx. 685, 688 (10th Cir. 2017) (unpublished) ("The degree to which an expert may reference (let alone rely upon) a report made by another person not called as a witness is not clearly established, particularly given the 4–1–4 divide of the opinions in *Williams*."); Hill v. Virga, 588 Fed. Appx. 723, 724 (9th Cir. 2014) (unpublished) ("The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violates the Confrontation Clause.").[3]

---

[3] Although the issue was slightly different because there was no objection to the testimony at trial, this Court has reviewed the relevant post-Crawford decisions detailed above and concluded, "There was no existing case explaining when it is appropriate for a trial court to sua sponte raise the issue of the potential inadmissibility of non-testifying expert reports, especially where the parties stipulated to the authenticity of documents and reserved the

Because there is no clearly established Supreme Court precedent that barred the admission of Dr. Rorke-Adam's testimony regarding the creation and staining of the slides by her technician, the Idaho Supreme Court's decision cannot be contrary to, or an unreasonable application of, Supreme Court precedent, and Stanfield's Claim 1 fails.

> f.   The Idaho Supreme Court's Decision Was Not An Unreasonable Application Of Supreme Court Precedent[4]

Even if clearly established Supreme Court precedent existed, Claim 1 fails. Whether viewed under the "primary purpose of accusing a targeted individual" test, Williams, 576 U.S. at 83, the "primary purpose of creating a record for use at a later criminal trial" test described in U.S. v. James, 712 F.3d 79, 96 (2nd Cir. 2013), or the limited analysis from Crawford and Davis, Stanfield has failed to establish a Confrontation Clause violation. The Supreme Court "has repeatedly explained that, when it comes to AEDPA, the more general the federal rule, the more leeway state courts have in reaching outcomes in case-by-case determinations before their decision can be fairly labeled unreasonable." Davenport, 142 S.Ct. at 1530 (quotes, citations, brackets omitted). Based upon the state's argument in the prior section that is interwoven with this section, the Supreme Court's decisions give states exceptional leeway when determining whether a Confrontation Clause violation has occurred under these facts. Even under de novo review Claim 1 fails.

---

right to object to admissibility at trial, but defense counsel chose not to object." Grove v. Carlin, 2020 WL 2045546, *16 (D. Idaho 2020) (unpublished).

[4] Stanfield also contends the Idaho Supreme Court's decision is "based on an unreasonable determination of the facts in light of the evidence presented in state court." (Dkt. 1, p.6.) However, she fails to articulate any facts that were unreasonably determined by the Idaho Supreme Court. Therefore, Stanfield has waived any aspect of 2254(d)(2). Moreover, the state cannot address the argument because of Stanfield's failure to properly plead what facts were unreasonably determined by the Idaho Supreme Court.

First, there is no evidence establishing that the police were involved in having Dr. Rorke-Adams examine W.F.'s brain. Rather, that decision was made by either the prosecutor and/or Dr. Garrison. (State's Lodging A-4, pp.900-01, 927-28.) Second, the purpose of sending W.F.'s brain to Dr. Rorke-Adams was not to gather evidence for prosecution, but to determine what caused W.F.'s death, which could have been, as contended by Stanfield, accidental. Third, the lab technician's work was not done to accuse a targeted individual, which meant that technician could not have known that the autopsy of W.F.'s brain and the autopsy report inculpated Stanfield. In other words, the work completed by the technician did not involve "statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct." Williams, 567 U.S. at 82. Fourth, the lab technician's work did not involve "formalized statements such as affidavits, depositions, prior testimony, or confessions." Id. Rather, as explained by Dr. Rorke-Adams, the lab technician merely provided

> documentation to the fact that she received the tissue, the stain that we requested her to do, and she notes when she did it, and then when she handed it back to us. Those are the only pieces of documentation. This is the standard procedure in the laboratory for every case.
>
> And so the label of the material is attached to the material. It remains with the material. Then the slides are prepared by the technician and the slides are labeled with the same number that was attached to that specimen so we know that Specimen 500 came from John Smith. And so we evaluate – we evaluate it, write a report, and that report goes into the permanent record.

(State's Lodging A-5, pp.1998-99.)

Fifth, there is no evidence establishing that examination of W.F.'s brain was done pursuant to state statute. Sixth, there was nothing in the lab technician's work that directly linked Stansfield as the perpetrator of a particular crime. Seventh, while Dr. Rorke-Adams

did not personally observe the technician prepare the slides, she explained how she was

able to determine if the correct stain was properly applied:

> [T]here's always a control slide that goes with it.  Control slide means that -- in this particular case, I asked for a specific antibody to be applied to this tissue.
>
> ****
>
> We fill out a request sheet.  We ask specifically for that antibody to be applied to the tissue.  It's given to the technician along with the specimen.  The technician then knows which antibody to use.  Those technical procedures are done in that special laboratory.
>
> And then that prepared slide is given to the pathologist along with the sheet, the request sheet that we made out asking for antibody, plus a control slide, which means that another piece of tissue that was known to contain this particular antigen that we're interest in has been used to corroborate the validity of the stain from the unknown slide.
>
> So we look at the control slide first to make certain that the technique was working so that we can rely then upon what we're looking at in the unknown slide.
>
> So these are all standard procedures in the laboratory, and this is the way it is done every day for all of the cases that come through.

(Id., pp.2000-02.)  Additionally, Dr. Rorke-Adams supplied Stanfield with the stain that

was used.  (Id., p.2003.)

Finally, Dr. Rorke-Adams explained the purpose of the staining (id., pp.2022-26),

discussed axonal injuries in the brain stem and spinal cord generally (id., pp.2026-34),

explained that, reviewing the slides, she found axonal injuries in W.F.'s spinal cord,

medulla, and brain stem (id., pp.2034-56), and offered her opinion – the sixth diagnosis –

that was based **only in part** on the slides provided by the technician – "primary acute deep

cerebral, cerebellar brain stem and spinal cord contusions/lacerations with axonal injury,

secondary to angular acceleration forces" (id., p.2058).  Dr. Rorke-Adams explained that

her finding of contusions was based upon her examination of "microscopic sections, and that "secondary to angular acceleration forces" meant "[t]hat this injury to the nervous system was produced by these forces in which this child's head was violently rotated or hyperextended with sufficient force to tear these fibers and produce the damage." (Id.)

Stanfield's case is even less compelling than <u>Grim</u>, *supra,* where a forensic scientist was permitted to testify regarding the testing of cocaine that was completed by another analyst. 816 F.3d at 299. The testifying scientist discussed the procedures followed by the other analyst, explained that the report completed by the other analyst was reviewed by a "technical reviewer" who "ensures that the analyst did proper examinations, that the analyst's interpretation of the results of the examinations is correct, that the conclusion of the analyst from the collective examinations is correct, and that the conclusion is conveyed in an understandable manner in the report." <u>Id.</u> The testifying scientist explained he did not physically analyze the cocaine, but took procedures to ensure that the non-testifying analyst had done proper testing. <u>Id.</u> at 299-300. The scientist testified that the evidence contained cocaine base and that the amount submitted to the laboratory was 3.2 grams. <u>Id.</u> at 300. After reviewing Supreme Court and federal circuit precedent, <u>id.</u> at 305-10, the Fifth Circuit concluded the state court's decision was not contrary to, or an unreasonable application of, clearly established federal law as established by the Supreme Court, <u>id.</u> at 310. While the court focused upon the lack of Supreme Court precedent, it recognized that "Frazure examined the analyst's report and all of the data, including everything the analyst did to the item of evidence; ensured the analyst did the proper tests and that the analyst's interpretation of the tests results was correct; ensured that the results coincided with the

conclusion in the report; agreed with a reasonable degree of scientific certainty with the examinations and results of the report; and signed the report." Id.

In Washington v. Griffin, 876 F.3d 395, 400-02 (2nd Cir. 2017), a criminalist, who did not perform all the necessary tasks associated with obtaining a DNA profile, testified regarding a swab taken to obtain a DNA profile. Washington raised a Confrontation Clause claim because the analysts who generated the DNA profile and made notations in the file did not testify. Id. at 403. After examining Supreme Court precedent, the court concluded, "the Supreme Court has never held that the Confrontation Clause requires an opportunity to crossexamine each lab analyst involved in the process of generating a DNA profile and comparing it with another, nor has it held that uncertified, unsworn notations of the sort at issue here are testimonial." Id. at 404-07. After examining Williams, the court reasoned, "Washington fails to show that reasonable jurists would all agree as to the narrow rule to be drawn from the plurality opinion." Id. at 409. The court also recognized that "the plurality opinion at no point affirms that in the 'targeted suspect scenario,' the Confrontation Clause necessary applies." Id. at 410. Finally, the court explained:

> As to DNA testing in particular, the plurality also deemed it significant that when the work of a lab is divided up among a number of analysts, the likelihood is that the only purpose of each analyst is to perform his or her task in accordance with accepted procedures'—at least suggesting that in such circumstances, the primary purpose of out-of-court notations may not be testimonial, regardless whether a suspect has been identified. The use at trial of a DNA report prepared by a modern, accredited laboratory, … bears little if any resemblance to the historical practices that the Confrontation Clause aimed to eliminate.

> In such circumstances, we agree with the district court that whether the plurality [in Williams] would hold that the primary purpose of those preparing Washington's DNA profile implicated the Confrontation Clause is, at the very least, debatable.

Id. at 410 (brackets, quotes, citations omitted); *see also* <u>Garrett v. Madden</u>, 859 Fed. Appx. 156, 158 (9th Cir. 2021) (unpublished) ("[w]e find fair-minded jurists would disagree about whether admitting the challenged evidence violated clearly established federal law, especially given substantial ambiguity in this area."); <u>Jimenez v. Allbaugh</u>, 702 Fed. Appx. 685, 688 (10th Cir. 2017) (unpublished) ("[O]pinion testimony will not violate the Confrontation Clause when the testifying expert provides an independent judgment, even if the testimony is in some part based on inadmissible evidence.").

In Stanfield's case, the lab technician did not even complete a report or interpret any of the "data" from the slides. Nevertheless, as explained above, using the control slide Dr. Rorke-Adams was able to ensure the technician properly completed the task asked of her using the correct stain. All the facts in Stanfield's case distinguish the Supreme Court cases discussed above and discussed by the Idaho Supreme Court. Whether Claim 1 is reviewed under AEDPA or *de novo*, it fails because there is no Confrontation Clause violation since the information from the lab technician was not testimonial.

### g.    Claim 1 Violates The New Rule Doctrine

In <u>Teague v. Lane</u>, 489 U.S. 288 (1989), the Supreme Court adopted a new standard regarding the retroactive application of new constitutional rules for cases on collateral review. The Court explained a "habeas court need only apply the constitutional standards that prevailed at the time the original proceedings took place." Id. at 306. A three-step process is required to complete the <u>Teague</u> analysis:

> First, [the court] determines the date upon which the defendant's conviction became final. Second, [the court] must survey the legal landscape as it then existed, and determine whether a state court considering the defendant's claims at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule he seeks was required by the

Constitution.  Finally, if the court determines that the habeas petitioner seeks the benefit of a new rule, the court must consider whether the relief sought falls within one of the two narrow exceptions to nonretroactivity.

Lambrix v. Singletary, 520 U.S. 518, 527 (1987) (quotes, citations, and brackets omitted).

Finality has been defined "for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied."  Caspari v. Bohlen, 510 U.S. 383, 390 (1994).   However, the Ninth Circuit has recognized that "finality should be measured from the time when the decision under review – be it the conviction or the sentence – was actually made because the whole purpose of Teague is to validate reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions."  Leavitt v. Arave, 383 F.3d 809, 816-17 (9th Cir. 2004).

A "new rule" is defined "as a rule that breaks new ground, imposes a new obligation on the States or the Federal Government, or was not dictated by precedent existing at the time the defendant's conviction became final."  Saffle v. Parks, 494 U.S. 484, 488 (1990) (quotes and citation omitted, emphasis in original).  In determining whether the result is "dictated," the court must determine whether the result was apparent to all reasonable jurists; that is, "whether no other interpretation was reasonable."  Lambrix, 520 U.S. at 538 (emphasis in original).  The Ninth Circuit has held that a rule is not dictated by precedent where reasonable courts might differ in the rule's application. Leavitt, 383 F.3d at 820-21 ("jurists in 1989 considering Supreme Court, circuit, and state court precedent would not have felt compelled to hold that Leavitt's jury convicted him on a diluted burden of proof solely because some courts had disapproved instruction 12"); Greenawalt v. Ricketts, 943

F.2d 1020, 1024-25 (9th Cir. 1991). Even if a federal circuit provides precedent for Stanfield's claim, the Ninth Circuit has recognized that, when there is no Supreme Court precedent and the circuits are split on a question of law, "any finding of constitutional error would create a new rule" in violation of <u>Teague</u>. <u>Turner v. Marshall</u>, 63 F.3d 807, 818-19 (9th Cir. 1995), *rev'd on other grounds*, <u>Tolbert v. Page</u>, 182 F.3d 677 (9th Cir. 1999).

The Supreme Court also discussed two "exceptions." <u>Lambrix</u>, 520 U.S. at 539. The first exception "permits the retroactive application of a new rule if the rule places a class of private conduct beyond the power of the State to proscribe, or addresses a substantive categorical guarantee accorded by the Constitution, such as a rule prohibiting a certain category of punishment for a class of defendants because of their status or offense." <u>Id.</u> (quotes, citations, brackets omitted). The second exception applies to "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." <u>Id.</u> (quotes and citation omitted). However, the Supreme Court recently eliminated the watershed exception, reasoning that "no new rules of criminal procedure can satisfy the watershed exception," and concluding, "[n]ew procedural rules do not apply retroactively on federal collateral review." <u>Edwards v. Vannoy</u>, 141 S.Ct. 1547, 1559-60 (2021). Violations of the Confrontation Clause involve procedural rules and are not retroactive. *See* <u>Whorton v. Bockting</u>, 549 U.S. 406, 417 (2007).

As explained above, there is no Supreme Court precedent that has addressed whether a lab technician who merely completes an assigned task by staining tissue on slides is testimonial for purposes of determining whether there is a Confrontation Clause violation. Federal and state courts have disagreed regarding the application and extension of prior Supreme Court precedent in this scenario. Additionally, the Ninth Circuit has not

explicitly addressed the question, and recognized that <u>Melendez-Diaz</u> did not address the question Stanfield presents in her habeas petition. <u>Flournoy</u>, 681 F.3d at 1005.

Claim 1 would result in a new rule of law in violation of <u>Teague</u>. Therefore, even if this Court determines Claim 1 is not governed by AEDPA, it must be dismissed because of the conflict among state and federal jurisdictions, which establishes the result was not apparent to all reasonable jurists, that is, "whether *no other* interpretation was reasonable." <u>Lambrix</u>, 520 U.S. at 538 (emphasis in original).

    h.    <u>Any Alleged Error Is Harmless</u>

In habeas, "petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.''" <u>Davis v. Ayala</u>, 576 U.S. 257, 267 (2015) (quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). "[R]elief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had '[a] substantial and injurious effect or influence in determining the jury's verdict.'" <u>Id.</u> at 267-68 (quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 436 (1995)). This involves more than a "'reasonable possibility' that the error was harmful." <u>Id.</u> at 268 (quoting <u>Brecht</u>, 507 U.S. at 637). "Review for harmless error under *Brecht* is more forgiving to state court errors than the harmless error standard the Supreme Court applies on its direct review of state court convictions." <u>Larson v. Palmeteer</u>, 515 F.3d 1057, 1064 (9th Cir. 2008) (quotes and citation omitted). Although the Ninth Circuit has previously opined that, "[w]hile there is no burden of proof *per se*, we look to the State to instill in us a fair assurance that there was no effect on the verdict," <u>Shaw v. Terhune</u>, 380 F.3d 473, 478 (9th Cir. 2004) (quotes and citations omitted), that opinion is in serious doubt. As explained in <u>Davenport</u>, 142 S.Ct. at 1525 (quotes and citations omitted), "under *Brecht*, a petition may prevail by

persuading a federal court that it alone should harbor grave doubt – not absolute certainty – about whether the trial error affected the verdict's outcome." *See also* id. at 1524 (quotes and citations omitted) ("So even when a petitioner who prevails under AEDPA must still today persuade a federal habeas court that law and justice require relief. And whatever else those inquiries involve, they continue to require federal courts to apply this Court's precedents governing the appropriate exercise of equitable discretion–including *Brecht*."). Harmless error has been applied in Confrontation Clause cases, Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986), including under the Brecht standard, Morales v. Woodford, 388 F.3d 1159, 1180 (9th Cir. 2004); Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir. 1988).

Initially, as detailed above, multiple other experts testified that W.F. died from abusive head trauma, not an accidental injury as alleged by Stanfield. While Dr. Hilvers did not opine that W.F. had abusive head trauma, based upon W.F.'s neurologic presentation, Dr. Hilvers was "concerned about brain injury." (State's Lodging A-5, p.2165.) Based upon "cumulative signs" that included "bruising, the extensive retinal hemorrhages, the bleeding in his head, the subdural hemorrhages, the progressive brain swelling, … just horrible neurological exam with minimal brain stem function," Dr. Jansen opined that W.F. died from "abusive head trauma," and that his injuries could not be caused by falling over and hitting his head on a carpeted surface or becoming angry and throwing himself to the ground and striking his head on a carpeted surface as alleged by Stanfield. (State's Lodging A-4, pp.1125-26.) Dr. Cherny rendered the same expert opinion. (Id., pp.1224, 1227-29.) Dr. Fishborn opined the retinal hemorrhages in W.F.'s eyes "showed severe trauma," "would be a significant form of nonaccidental injury," could be "a finding of shaken baby syndrome," and explained he had never seen those types of hemorrhages

"from a little boy who ha[d] fallen from [ ] 34-1/2 inches" as alleged by Stanfield. (Id., pp.773, 776, 789, 790.) Based upon a high degree of medical certainty," Dr. Sexton opined that W.F. "was the victim of physical abuse, having "suffer[ed] abusive head trauma." (State's Lodging A-5, pp.2796-97.) Dr. Bell rejected Stanfield's accidental injury stories (State's Lodging A-4, p.893), and explained, "this was caused by abusive head trauma" (id., pp.894-95). Dr. Garrison opined that W.F. was "[a]n abused child" (id, p.1751), who died from "blunt force trauma to the head secondary to the actions of another person" (id., pp.1690-91). He further explained the reason he sent the brain and spinal cord to Dr. Rorke-Adams was because he could not see contusions or bruising on the brain with the naked eye. (Id., pp.1838-39.) Dr. Rorke-Adams found the contusions and bruising with the aid of a microscope. (State's Lodging A-5, pp.2138-39.) Finally, Dr. Crawford opined that his findings were consistent with abusive head trauma involving "repetitive acceleration-deceleration forces." (Id., pp.995-96.)

Dr. Rorke-Adams' testimony was merely icing on the cake that further corroborated seven other experts who all concluded W.F. did not die from an accident as alleged by Stanfield, but died as a result of abusive head trauma. Virtually all of Dr. Rorke-Adams' diagnoses did not even involve the tissue stained by the lab technician. (State's Lodging A-5, pp.2007-19, 2057-58.) Only the sixth diagnosis involved reviewing the stained slides, which showed "axonal injury, secondary to angular acceleration forces." (Id., p.2058.) Dr. Rorke-Adams agreed that she was "able to see the laceration and contusions using [her] special staining **as well as** a microscopic exam." (Id., pp.2138-39) (emphasis added).

Second, the multiple, changing stories by Stanfield regarding how W.F. was injured was unaffected by testimony from Dr. Rorke-Adams involving the stained slides. More

importantly, Stanfield instructed Lance to "take [his] time" getting to an interview with Detective Vucinich, and that she was going to a hotel to avoid being arrested (State's Lodging A-5, pp.2960-61), and conceded she parked her car behind the hotel so "nobody could find her" (id., p.2960). "Evidence of flight, escape, or failure to appear on the part of a defendant is often identified as relevant to demonstrate consciousness of guilt." State v. Thumm, 285 P.3d 348, 369 (Idaho Ct. App. 2012); *see also* State v. Moore, 965 P.2d 174, 179 (Idaho 1998) (quotes and citation omitted) (whether evidence is sufficient to indicate that flight occurred is a question that should be left to argument to the jury by the parties); Phillips v. Ornoski, 673 F.3d 1168, 1190 (9th Cir. 2012) ("Phillips's flight to another state and his effort to conceal his identity provided further significant evidence of his guilt."); U.S. v. Harris, 792 F.2d 866, 869 (9th Cir. 1986) ("Evidence of flight is generally admissible as evidence of consciousness of guilt and of guilt itself.").

Third, W.F.'s injuries seen by EMT's at the house, and Stanfield's stories and demeanor, were not consistent with an accident. (State's Lodging A-4, pp.436-39, 444, 493, 539, 661, 687-94, 726-45, 1340-41, 1396-97, 1583-86; State's Lodging A-5, pp.2520-25, 2546-47, 2572.) Chaplain Carla Nielsen explained that, even after the decision to terminate life support was made, Stanfield showed no emotion nor was "acting at all bereaved," which was totally different from the 100's of childrens' deaths Nielsen had attended. (State's Lodging A-5, pp.3019, 3025.)

Fourth, Stanfield's stories about W.F.'s physical abilities and health were not even consistent with W.F.'s treating physician, who testified he had "absolutely no concerns" regarding W.F (id., pp.1876-77), and did not observe any equilibrium concerns at W.F.'s last well-baby check on November, 10, 2000 (id., pp.1887-92). W.F.'s prior babysitter

also disputed Stanfield's contentions regarding his behavior and physical abilities (State's Lodging A-5, pp.1956-59), as did a babysitter that "filled in" (id., pp.2213-16, 2227-30). W.F.'s great-grandmother, Barbara Stearns, saw W.F. on a regular basis and agreed he had no equilibrium or other issues as Stanfield claimed.  (State's Lodging A-4, pp.1554-60, 1563-68.)  Lance agreed that W.F. had no equilibrium problems (State's Lodging A-5, pp.2941-44, 3014), and while Lance may have previously discussed some medical concerns, they were "more [Stacie's] concerns" than Lance's, who thought they were "BS" (id., pp.3001-02).  W.F.'s paternal grandmother, Denise Dockstader, agreed W.F. did not have equilibrium problems and was not "clumsy."  (Id., pp.3575, 3579, 3588, 3606.)

Fifth, Stanfield's stories and testimony were inconsistent with C.D.'s testimony, who initially testified that he was in the kitchen, heard a "loud thump," and then went to W.F. with Stanfield.  (Id., pp.2633, 2637-39.)  This was somewhat consistent with Stanfield's testimony who contended that C.D. and J.D. were "[s]itting on the floor playing with the toys [when W.F. fell]"; she did not "recall [C.D] ever leaving the room to go to the bathroom." (Id., p.4194.)  However, after being shown transcripts of prior interviews, C.D. changed his testimony.  (Id., pp.2645-2648; *see also* State's Lodging A-10, pp.454-59 (Exhibit 228, pp.62-66); pp.485-92 (Exhibit 227, pp.6-13).)  He then testified consistently with what he told Officer Adams and the Health and Welfare worker, stating that he went to the bathroom after asking for a snack, shut the door, and then heard the thump as he was "heading back" to the kitchen, and he had never told anyone before that he was in the kitchen with Stanfield when he heard the thump.  (Id., pp.2648-50.)  Importantly, while in custody, Stanfield had a telephone conversation with Stacie, instructing her that "[C.D. needs to be honest and tell the truth where he was, because he

was right there." (Id., p.4245.) She further stated, "It doesn't look good for me if [C.D.] said he was out of the room in the bathroom." (Id., p.4260.) While Stanfield contended that she was not trying to have Stacie manipulate C.D. (Id. p.4245), the jury was certainly permitted to conclude otherwise since there was absolutely no reason for Stanfield to even raise the issue, let alone to tell Stacie it didn't look good if C.D. testified to the same things he told Officer Adams and the Health and Welfare 2orker.

Sixth, Stanfield's testimony was also inconsistent with J.D.'s testimony, who explained that he was in a different room when W.F. was injured and did not see him fall, and C.D. was in the bathroom at the time. (State's Lodging A-5, pp.3693-3694, 3716-17.)

When all the other evidence establishing Stanfield's guilt is considered, Dr. Rorke-Adams' testimony regarding the stained tissue did not have a substantial and injurious effect or influence on the jury's verdict. Consequently, even if this Court addresses the merits of Stanfield's claim *de novo*, she is not entitled to habeas relief.

>       2.      Claim 2: The Trial Court Properly Instructed The Jury

>               a.      Introduction

In Claim 2, Stanfield contends she was denied due process because the jury instructions allegedly failed to "require the jury to find that [she] had specific intent to cause an aggravated battery before convicting her of first degree murder," and that the definition of battery under I.C. § 18-903 "elevates a battery to murder without an accompanying mental state to commit an underlying felony." (Dkt. 1, pp.6-7.) Stanfield's claim fails because there is no clearly established Supreme Court precedent mandating that, before a misdemeanor can be elevated to a felony, the jury must be instructed that the misdemeanor was committed with specific intent. Rather, state courts are free to determine

the elements necessary to prove criminal acts and those determinations are not reviewable in federal habeas. Irrespective, Stanfield has failed to establish the Idaho Supreme Court's decision was contrary to, or an unreasonable application of, Supreme Court precedent, or was based on an unreasonable determination of facts. Even under *de novo* review her claim fails, and any alleged error is barred by the new rule doctrine and is harmless.

b.     <u>Relevant Facts And Idaho Supreme Court Decision</u>

During the instruction conference, there was significant discussion regarding the elements instructions. (State's Lodging A-6, pp.4326-53.) Ultimately, neither party had any objections. (Id., pp.4364-65.) Nevertheless, on appeal, Stanfield contended she was deprived of due process because the jury was not instructed "that she had the specific intent to cause great bodily harm to [W.F.]." (State's Lodging B-1, p.28.) Relying upon <u>State v. Carver</u>, 314 P.3d 171, 174-76 (Idaho 2013), the state addressed the merits of her claim. (Id., pp.18-19.) Stanfield replied, "Mindful of the *Carver* decision, [she] maintains that her conviction must be vacated because the jury was not properly instructed on all the elements of the offense." (State's Lodging B-3, p.19.) Relying upon <u>Carver</u>, which involved an identical claim, the Idaho Supreme Court concluded there was error in the elements instructions. (State's Lodging B-4, pp.20-21.)

c.     <u>Relevant Idaho Statutes And Jury Instructions</u>

The Indictment charged that Stanfield, "did unlawfully kill with malice aforethought, and murder, [W.F.], a human being, in the perpetration of or attempt to perpetrate the crime of Aggravated Battery on a child under the age of twelve (12) years, to-wit: of the age of two and a half (2½) (DOB: 05/10/2007), by the willful and unlawful

use of force or violence upon said child, causing great bodily injury, to-wit: a fatal brain injury, from which the child died on December 13, 2009," all in violation of I.C. §§ 18-4001, 4002, 4003(a), and (d). (State's Lodging A-1, pp.17-18.)

Idaho Code § 18-4001 defines murder as follows:

> Murder is the unlawful killing of a human being including, but not limited to, a human embryo or fetus, with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being. Torture is the intentional infliction of extreme and prolonged pain with the intent to cause suffering. It shall also be torture to inflict on a human being extreme and prolonged acts of brutality irrespective of proof of intent to cause suffering. The death of a human being caused by such torture is murder irrespective of proof of specific intent to kill; torture causing death shall be deemed the equivalent of intent to kill.

Idaho Code §18-4003 provides the degrees of murder, and in relevant part states:

> (d) Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem, or an act of terrorism, as defined in section 18-8102, Idaho Code, or the use of a weapon of mass destruction, biological weapon or chemical weapon, is murder of the first degree.

The elements instructions read as follows:

INSTRUCTION 21

Murder is the killing of a human being without legal justification or excuse in the perpetration of, or attempt to perpetrate, and aggravated battery on a child under twelve (12) years of age.

INSTRUCTION 22

In order for the defendant to be guilty of First Degree Murder, the state must prove each of the following:

1.    On or about December 11, 2009,

2.    in the State of Idaho,

3.    the defendant Katherine Lea Stanfield committed an aggravated battery on a child, [W.F.], under twelve (12) years of age, and

4. in doing so, caused the death of [W.F.].

If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

## INSTRUCTION 22A

The state does not have to prove that the defendant intended to kill [W.F.], but the state must prove that during the perpetration or attempt to perpetrate an aggravated battery on a child under (12) years of age, the defendant killed [W.F.].

(State's Lodging A-2, pp.695-97.)

Defining the terms applicable to the elements instructions, the jury was further

instructed as follows:

## INSTRUCTION 19

A "battery" is committed when a person willfully and unlawfully uses force or violence upon the person of another.

## INSTRUCTION 20

An "aggravated battery" is a battery which causes great bodily harm.

## INSTRUCTION 23

An act is "willful" or done "willfully" when done on purpose. One can act willfully without intending to violate the law, to injury another, or to acquire any advantage.

(Id., pp.693-94, 698.)

The jury was also instructed on the requisite intent as follows:

## INSTRUCTION 25

In crimes, such as the one charged, there must exist a union or joint operation of act or conduct and criminal intent. To constitute criminal intent[,] it is not necessary that there should exist an intent to violate the law. Where a person intentionally does that which the law declares to be a crime, she is acting with criminal intent, even though she may not know that her act or conduct is unlawful.

(Id., p.700.)

d.     Supreme Court Decisions Regarding Jury Instructions

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." Carella v. California, 491 U.S. 263, 265 (1989) (citing In re Winship, 397 U.S. 358, 354 (1970)).  Instructions that relieve the states of this burden violate a defendant's due process rights.  Id.  However, "[t]here is no doubt that [federal courts] are bound by a state court's construction of a state statute," Wisconsin v. Mitchell, 508 U.S. 476, 483 (1993), which includes the state court's "interpretation of state law, including its determination of the elements of" criminal statutes, Johnson v. U.S., 559 U.S. 133, 138 (2010).  See also Terminello v. Chicago, 337 U.S. 1, 5 (1949) (finding the Illinois court's definition of the terms in a criminal statute "are conclusive on us").  As explained in Patterson v. New York, 432 U.S. 197, 201 (1977) (quotes and citation omitted), "It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government, and that we should not lightly construe the Constitution so as to intrude upon the administration of justice by the individual states."  In Martin v. Ohio, 480 U.S. 228, 235 (1987), the Court recognized that unlawfulness was essential for a conviction of the charged crime, but noted that Ohio courts had held "that the unlawfulness in cases like this is the conduct satisfying the elements of aggravated murder-an interpretation of state law that we are not in a position to dispute."  In Estelle v. McGuire, 502 U.S. 62, 71-72 (1991), the Court expressly applied this principle to a jury instruction addressing prior injury evidence that the defendant contended violated due process.  Rejecting the claim, the Court explained, "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief."  See also Gilmore v.

Taylor, 508 U.S. 333, 342 (1993) ("instruction that contains errors of state law may not form the basis for federal habeas relief").

        e.       <u>Claim 2 Involves A State Law Question That Is Non-Cognizable In Habeas</u>

Federal habeas corpus relief does not lie for errors of state law, <u>Lewis v. Jeffers</u>, 497 U.S. 764, 778 (1990), nor do federal courts have jurisdiction to review state court application of state procedural rules, <u>Poland v. Stewart</u>, 169 F.3d 573, 584 (9th Cir. 1999). Moreover, errors of state law cannot be repackaged as federal errors simply by citing the due process clause. <u>Id.</u> (citing <u>Langford v. Day</u>, 110 F.3d 1380, 1389 (9th Cir. 1997)) (alleged errors in the application of state law do not present cognizable federal constitutional claims).

In <u>Aponte v. Eckard</u>, 2016 WL 8201308, *10 (E.D. Penn. 2016) (unpublished) (quotes and citations omitted), the court rejected a claim based upon the trial court's failure to instruct on self-defense since it "is non-cognizable because the AEDPA restricts federal habeas review on a petition filed by a petitioner to claims based on the ground that he is in custody in violation of the Constitution, or laws or treaties of the United States. Accordingly, federal courts reviewing habeas claims cannot reexamine state court determinations on state law questions."

Likewise, Stanfield's Claim 2 is nothing more than a repackaged due process claim contending there was a violation of state law when the trial court failed to give an additional intent instruction that the Idaho Supreme Court has concluded was contrary to state law. As such, Claim 2 is non-cognizable and should be dismissed.

f.     The Idaho Supreme Court's Decision Was Not An Unreasonable Application Of Supreme Court Precedent[5]

Like her prior claim, Stanfield's Claim 2 initially fails because there is no clearly established Supreme Court precedent that supports, let alone resolves, Claim 2.  Indeed, all the Supreme Court decisions cited above, establish that a state court's decision regarding the elements of a criminal act is definitive, and cannot be challenged in federal habeas.  *See* Purnell v. Brazelton, 2014 WL 1456294, *6 (S.D. Cal. 2014) (unpublished) (rejecting a claim that sentence violates state law because "that there is no clearly established federal law that holds that a violation of § 654 violates the United States Constitution.") Harris v. Figueroa, 2012 WL 4107867, *4 (C.D. Cal. 2012) (unpublished) ("To the extent petitioner asserts entitlement to habeas relief based on the state court's interpretation of its own criminal statutes, …federal habeas relief is not warranted on such a claim.").

Irrespective, even if clearly established Supreme Court precedent existed, Claim 2 fails under § 2254(d)(1).  In Goldyn v. Kayes, 444 F.3d 1062, 1070 (9th Cir. 2006), the court reaffirmed that the state court is "the final arbiter on questions of state law" and "has wide latitude in defining and interpreting the elements of [state] crimes," which precludes on habeas review reexamination of a state court's determination of state law questions. "But a state court is not free to define an element out of existence, or to ignore the element entirely when upholding a criminal conviction."  Id.; *see also* Aponte v. Gomez, 993 F.2d

---

[5] Like her prior claim, Stanfield also contends the Idaho Supreme Court's decision is "based on an unreasonable determination of the facts in light of the evidence presented in state court."  (Dkt. 1, p.6.)  Again, however, she fails to articulate any facts that were unreasonably determined by the Idaho Supreme Court, let alone any part of the court's opinion that was "based" on any unreasonable facts.  Therefore, Stanfield has waived any aspect of 2254(d)(2).  Irrespective, the state will not speculate regarding what facts were unreasonably determined by the Idaho Supreme Court.

705, 707 (9th Cir. 1993) (quotes and citation omitted) ("[W]e must defer to the construction set for [by a state court] unless we find its interpretation is untenable or amounts to a subterfuge to avoid federal review of a constitutional violation."). However, Stanfield has not alleged the Idaho Supreme Court "define[d] an element out of existence," "ignore[d] the element entirely," or that its interpretation was "untenable or amounts to a subterfuge to avoid federal review of a constitutional violation." Rather, Claim 2 is based upon the allegation that the Idaho Supreme Court's decision merely "elevate[d] a battery to murder without an accompanying mental state to commit an underlying felony." (Dkt. 1, p.7.) Consequently, on this basis alone, Stanfield's Claim 2 fails.

It also fails because the Idaho Supreme Court properly interpreted statutes. The Idaho Supreme Cout explained that Stanfield's claim on direct appeal was identical to a claim raised in Carver, *supra* (State's Lodging, B-4, p.21); Stanfield does not contend otherwise in her Petition (Dkt. 1, pp.6-7). In Carver, the supreme court carefully examined the requisite statutes, jury instructions, and prior Idaho precedent, and concluded:

> A battery becomes an aggravated battery if in committing a battery the person causes great bodily harm. I.C. § 18-907(1)(a). A battery becomes aggravated battery because of the harm caused, not because of the intent to cause that harm. Here the district court correctly instructed the jury that Defendant would be guilty of first degree murder if he committed a battery upon the child which resulted in great bodily harm, from which the child died. Instructing the jury that Defendant had to have intended to cause great bodily harm to the child would not have been an accurate statement of the law.

Carver, 314 P.3d at 176.

In Jeffries v. Blodgett, 5 F.3d 1180, 1194 (9th Cir. 1993), the petitioner contended the trial court had improperly defined the elements of two statutory aggravating factors in a death penalty case, including the need for a specific mental state. The Ninth Circuit

recognized that two of the petitioner's proposed elements were not elements "as defined by the Washington Supreme Court. The prosecution need prove only those elements of the crime which are included in the definition of the offense." Id. And "[b]ecause it is the sole responsibility of the States to define the elements of their criminal offenses, Jeffries' first argument fails." Id. (citation omitted); *see also* Caldellis v. Obenland, 772 Fed. Appx. 434, 436-37 (9th Cir. 2019) (unpublished) (rejecting a claim that the Washington Supreme Court improperly set the elements of the crime of "extreme indifference" murder under Washington law); Somboon Timme Phaymany v. Taylor, 384 Fed. Appx. 552, 554-55 (9th Cir. 2010) (unpublished) (rejecting a claim that the trial court failed to properly instruct on the elements of attempted murder as an aider and abettor and a penalty enhancement); Stull v. Hedgpeth, 2011 WL 124762, *7 (E.D. Cal. 2011) (unpublished) (rejecting a claim regarding definitions in the instructions); Perez v Pliler, 2003 WL 21148388, *4-7 (N.D. Cal. 2003) (unpublished) (rejecting a claim that the trial errored by failing to give a requested instruction regarding the robbery felony-murder murder special circumstance).

Likewise, because this Court is bound by the Idaho Supreme Court's interpretation of the elements regarding felony-murder under Idaho's murder statutes, Stanfield cannot establish the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent, or that establish relief is warranted under *de novo* review.

g. Claim 2 Violates The New Rule Doctrine

Like the prior claim, Claim 2 also violates the new rule doctrine established in Teague, as modified in Edwards. There is no Supreme Court precedent that requires a defendant have specific intent to cause the underlying misdemeanor that can elevate a crime to a felony under the felony-murder rule. Neither is there any circuit or state court

precedent mandating such an intent or the giving of such an instruction. Rather, federal courts are required to follow state courts' interpretation of the elements of their respective criminal statutes. As such, the rule espoused by Stanfield would result in a violation of Teague and its progeny. Therefore, even if this Court determines Claim 2 is not governed by AEDPA, it must be dismissed because it is not apparent to all reasonable jurists that there are no other interpretations of the law.

h.    Any Alleged Error Is Harmless

Using the standard from Chapman v. California, 386 U.S. 18, 24 (1967), the Supreme Court has applied harmless error when a trial court fails to give a necessary elements instruction. Neder v. U.S., 527 U.S. 1, 15-18 (1999). In federal habeas, the Brecht standard has been applied when the trial court fails to give a necessary elements instruction. Evanchyk v. Stewart, 340 F.3d 933, 940-41 (9th Cir. 2003). If there was error in this case, Stanfield has failed to establish it was not harmless under Brecht.

As detailed above, the evidence clearly established that Stanfield had specific intent to commit an aggravated battery by causing great bodily harm. As explained in State v. Clark, 772 P.2d 263, 264-65 (Idaho Ct. App. 1989), it is not necessary to define the phrase, "great bodily harm" because it is adequately defined by the plain words in I.C. §§ 18-903(b) and 18-907(a). See Comment Idaho Criminal Jury Instructions, Instruction 1207 ("The committee recommends that the phrase 'great bodily injury' not be defined."). Both of those statutes were included in the instructions here. (State's Lodging A-3, pp.693-94.)

While Stanfield's motive for injuring W.F. remains somewhat elusive, the shear force required to cause the abusive head trauma and other injuries found by the state's respective experts, as well as the testimony of the first responders at the house, clearly

establish she intended to harm W.F., even though Idaho law does not require such a finding by the jury. Indeed, this case is similar to <u>Spicer v. Gregoire</u>, 194 F.3d 1006, 1008 (9th Cir. 1999), where the trial court gave an instruction placing on the defense the burden of proving consent in a rape case. Without reaching the constitutionality of the instruction, the Ninth Circuit reasoned the jury would not have come to a different verdict even if the trial court had given a proper instruction, because the conviction "rested solely on the jury's assessment of who was more credible, Spicer or S.M; and extensive evidence, such as bruising on S.M.'s arms and wrists, duct tape found in S.M.'s bedroom, residue on S.M.'s wrists, and witnesses' testimony of S.M.'s emotion state after the rape, corroborated S.M.'s story." <u>Id.</u> at 1008-09; *see also* <u>Raviart v. McGrath</u>, 619 Fed. Appx. 620, 621 (9th Cir. 2015) (quotes and citation omitted) (unpublished) (rejecting a claim that the trial court erred by failing to instruct on the mental state for assault because "[s]ubstantial evidence established that Raviart came face to face with Officer Wagstaff while pointing his gun"); <u>Pisa v. Blanks</u>, 197 Fed. Appx. 586, 588 (9th Cir. 2006) (unpublished) (relying upon the evidence to conclude any alleged error was harmless under <u>Brecht</u>); <u>Mai v. Prunty</u>, 75 Fed. Appx. 586, 588 (9th Cir. 2003) (unpublished) ("there was ample evidence presented to the jury establishing that Mai committed his own provocative acts").

Based upon the exceptionally compelling testimony and evidence presented by the state at her trial, it is clear the jury found Stanfield's denials were not credible, especially considering the medical evidence, the observations of the first responders, Stanfield's constantly changing stories, and C.D and J.D.'s testimony. Therefore, any alleged error did not have a substantial and injurious effect on the jury's verdict.

3.      <u>Claim 3: IAC For Failing To Request Included Offense Instructions</u>

    a.      <u>Introduction</u>

In Claim 3, Stanfield contends she was denied effective assistance of trial counsel because her attorneys declined to request any included offense instructions. (Dkt. 1, pp.8-10.) This claim fails because, whether reviewed under AEDPA or *de novo*, Stanfield has failed to establish both deficient performance and prejudice as a result of counsels' tactical decision not to request any included offense instructions.

    b.      <u>Relevant Facts And Idaho Supreme Court Decision</u>

During the jury instruction conference, the prosecutor asked, "I guess just on the issue of lesser includeds, I just was to make sure for the record counsel is not requesting any." (State's Lodging A-6, p.4353.) When the trial court asked counsel regarding whether they would be asking for any lesser included offense instruction, the first attorney definitively responded, "We're not," and the second attorney also responded, "No, Your Honor, we're not. I don't think there's a factual scenario to have it fit." (Id., pp.4353-54.)

In her amended post-conviction petition, Stanfield contended trial counsel were ineffective for waiving all included offenses. (State's Lodging C-1, pp.113-14.) The post-conviction court, who was also the trial judge, found that Stanfield failed to establish deficient performance because a request for included offense instructions "is a quintessential tactical decision" that cannot be second guessed unless it was shown that the decision "resulted from inadequate preparation or ignorance of the law." (Id., p.318.) Stanfield also failed to establish prejudice because "a jury that is instructed on included-offenses must be instructed not to consider them unless it first finds the defendant not guilty of the charged offense, and it is presumed to have followed its 'acquittal first' instruction.

Having found Stanfield guilty of first-degree murder, the jury would've had no occasion to consider any included offenses, had it been instructed on them." (Id.) (citation omitted).

Stanfield raised the same issue on appeal (State's Lodging D-3, pp.18-20), and also contended the acquittal first doctrine violates due process because it "deprives a defendant of the right to have a jury consider the full range of her possible culpability" (id., p.19). After discussing the elements of an IAC claim (State's Lodging D-6, pp.5-6), the Idaho Supreme Court rejected Stanfield's claim, concluding she "cannot prove prejudice because of the acquittal first rule." (Id., p.12.) The court declined to address prejudice. (Id.)

### c. Standards Of Law Regarding IAC

Ineffective assistance of counsel claims are governed by Strickland v. Washington, 466 U.S. 668 (1984), which is "clearly established" for purposes of 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 n.2 (9th Cir. 1998). The purpose of effective assistance of counsel "is not to improve on the quality of legal representation . . . [but] simply to ensure that criminal defendants receive a fair trial." Pinholster, 563 U.S. at 189 (quoting Strickland, 466 U.S. at 689). To prevail on a claim of IAC, Stanfield must show her counsels' representation was deficient and that the deficiency was prejudicial. Strickland, 466 U.S. at 687.

The first element "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. In making this determination, there is a strong presumption that counsels' performance fell within the "wide range of professional assistance." Id. at 689. Stanfield has the burden of showing counsels' performance "fell below an objective standard of reasonableness." Id. at 688. The effectiveness of counsels' performance must

be evaluated from counsels' perspective at the time of the alleged error, not with twenty-twenty hindsight. Id. at 689. "Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge." Richter, 562 U.S. at 105. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Richter, 562 U.S. at 88.

Strategic and tactical choices are "virtually unchallengeable" if made after investigation of the law and facts. Strickland, 466 U.S. at 690-91. Strategic choices made after less than complete investigation are unchallengeable if "reasonable professional judgments support the limitations on investigation." Id. "Rare are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." Richter, 562 U.S. at 89. Counsel is permitted to formulate a strategy that was reasonable at the time and "balance limited resources in accord with effective trial tactics and strategies." Id.

The second element requires Stanfield to show "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. This requires Stanfield to demonstrate "a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome," id. at 694, which "requires a substantial, not just conceivable, likelihood of a different

result," Pinholster, 563 U.S. at 189 (quotes and citation omitted).  A reviewing court "must consider the totality of the evidence before the judge or jury," Strickland, 466 U.S. at 695, and reweigh that evidence "against the totality of available . . . evidence," Pinholster, 563 U.S. at 198 (quoting Wiggins v. Smith, 539 U.S. 510, 534 (2003)).

Overcoming Strickland's "high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  Because IAC claims provide a means to raise issues not presented at trial, the Strickland standard "must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve."  Richter, 562 U.S. at 105 (quotes and citation omitted).  More importantly, in federal habeas, the "pivotal question" is not "whether defense counsel's performance fell below Strickland's standard," but "whether the state court's application of the Strickland standard was unreasonable."  Id. at 101.  Simply put, federal courts "owe deference to both [trial counsel] and the state court.  Dunn v. Reeves, 141 S.Ct. 2405, 2410 (2021) (per curiam) (emphasis in original).  "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard."  Knowles v. Mirzayance, 556 U.S. 111, 123 (2009).  The reviewing court need not address both prongs of Strickland if an insufficient showing is made under only one prong.  Strickland, 466 U.S. at 697.

d.      Claim 3 Fails Under AEDPA And *De Novo* Review

Because the Idaho Supreme Court expressly declined to address deficient performance, the first prong of Strickland must be viewed *de novo*.  Wiggins v. Smith, 539 U.S. 510, 534 (2003).  However, based upon Idaho's felony-murder statutes and the instructions given regarding those statutes that are discussed in the prior section, "going

for broke was not an unreasonable tactical decision." <u>McAfee v. Thurmer</u>, 589 F.3d 353, 356 (7th Cir. 2009); *see also* <u>Crace v. Herzog</u>, 798 F.3d 840, 849 n.4 (9th Cir. 2015) ("Nothing we have said here affects a defense attorney's ability to make a strategic decision to forgo a lesser-included-offense instruction in order to force the jury into an 'all-or-nothing' decision."); <u>Moorman v. Ryan</u>, 628 F.3d 1102, 1112 (9th Cir. 2010) ("The finding of a strategic decision, supported by the trial record, would in all likelihood have foreclosed any holding of ineffective assistance of trial counsel as well.") <u>Woratzeck v. Ricketts</u>, 820 F.2d 1450, 1455 (9th Cir. 1987) (vacated on other grounds by <u>Woratzeck v. Ricketts</u>, 486 U.S. 1051 (1988)) (rejecting a claim that an included offense instruction should have been given since the defendant relied upon an alibi defense and an included offense instruction might have diluted that defense); <u>Gladden v. Runnel</u>, 2007 WL 1232175, *18 (E.D. Cal. 2007) (unpublished) (rejecting a claim that the trial court should have *sua sponte* instructed on the included offense of voluntary manslaughter because "petitioner's theory of defense was not that McBroome was killed in the heat of passion").

This is particularly true in Stanfield's case where her entire defense was premised upon the theory that she did absolutely nothing to injure W.F. and that his injuries and death were the result of some tragic accident. In other words, requesting included instructions would have been contrary to and undermined counsels' theory of the case that Stanfield did nothing to cause W.F.'s injuries or death. Undoubtedly, that is why counsel stated, "I don't think there's a factual scenario to have it fit" (State's Lodging A-6, p.4354), meaning, under the theory that Stanfield did nothing to cause W.F.'s injuries or death, there were no facts to support giving any included offense instructions. Consequently, even under *de novo* review, Stanfield has failed to establish deficient performance.

Contrary to Stanfield's contention (Dkt. 1, p.9), because the Idaho Supreme Court addressed Strickland's prejudice prong, it is entitled to AEDPA deference. Stanfield's argument is based upon the unsupported contention that Idaho's "acquittal first" doctrine "deprive[d her] of appellate review over a violation of a right – instructions on lesser included offenses when the evidence supports them – that she has under state law," which "prevented [her] from being able to prove the second element of that federal claim." (Id.) Of course, Stanfield has provided no authority for this bold proposition that appears to be akin to her due process argument raised before the state courts.

In State v. Raudebaugh, 864 P.2d 596, 600 (Idaho 1993), the Idaho Supreme Court carefully examined the acquittal first doctrine, which is based upon I.C. § 19-2132, recognizing it was deemed a due process violation in capital cases in Beck v. Alabama, 447 U.S. 625, 637 (1980), "because it forced the jury to choose between convicting the defendant of a capital offense and acquitting the defendant of the charge completely," which "created an impermissible possibility that a jury might choose to convict a defendant for the capital crime because they believed that the defendant was guilty of some crime and did not want to acquit the defendant wholly." The state court refused to extend Beck to non-capital cases "because the requirement does not present the jury with the drastic choice between acquittal and capital murder that was forced upon the jury in Beck." Id. at 600-01. As reasoned by the court:

> The acquittal first requirement guides the jury as to the order and method of considering the lesser included offenses and does not impermissibly increase the likelihood that the jury will reach an unwarranted verdict. The jury has the opportunity to convict of a lesser included offense, if it first acquits the defendant of each greater offense. We do not see in this formulation any coercion that would cause a jury to convict of a greater offense, if it was not unanimous in a guilty verdict.

Id. at 601.

Idaho is hardly alone in concluding that "no court has held that an acquittal first instruction given to a jury not considering whether to impose a death sentence violates due process." Williams v. McKee, 2008 WL 4910674, *10 (E.D. Mich. 2008) (unpublished) (order adopting magistrate's report and recommendation) (citing cases); *see also* Carbajal v. Dovey, 2010 WL 5392755, *5-6 (C.D. Cal. 2010) (unpublished) (rejecting a claim that an acquittal first instruction violated due process under state law;); Taylor v. Cate, 2009 WL 3126415, *14 n.7 (E.D. Cal. 2009) (unpublished) ("The only cases this court has found that condemn an acquittal first instruction as a matter of federal constitutional law are capital habeas cases from the Sixth Circuit.").

Stanfield's arguments regarding prejudice are without merit. Merely because the Idaho Supreme Court addressed the merits of Stanfield's Claim 3 under Strickland's prejudice prong based upon the acquittal first doctrine, does not mean she was deprived of appellate review. Not only has Stanfield failed to support her argument with supporting authority, but the state is also unaware of any such authority.

Irrespective, even if Claim 3 is reviewed *de novo* for the first time by this Court, Stanfield has failed to establish prejudice. Based upon the plethora of evidence detailed above establishing Stanfield's guilt and her tactical decision to defend the charge on the theory that W.F.'s injuries were the result of some accident, there is simply no basis for concluding there is a substantial likelihood of a different result had included offense instructions been given. Rather, Stanfield's case is remarkably similar to Woratzeck, 820 F.2d at 1455, where the Ninth Circuit reasoned it was "unpersuaded that a reasonable jury could have inferred from the evidence that Woratzeck committed theft but not robbery"

where the defendant elected to rely on an alibi defense. *See also* <u>Cunningham v. Evans</u>, 2009 WL 2449255, \*2 (E.D. Cal. 2009) (unpublished) (rejecting a claim that giving an acquittal first instruction violated due process because, "given the amount of evidence against him, [defendant] fails to demonstrate a 'reasonable probability' that the jury would have arrived at a different verdict had the instruction not been given").

Standfield's Claim 3 fails because, whether reviewed under AEDPA or de *novo*, she has failed to establish a substantial probability that the outcome would have been different if counsel had requested included offense instructions, and has failed under *de novo* review to establish deficient performance.

## V.
## <u>AVAILABILITY OF STATE COURT RECORDS</u>

The state is lodging relevant portions of the state court record with this Court pursuant to Rule 5 of the Rules Governing Section 2254 Cases.

## VI.
## <u>CONCLUSION</u>

WHEREFORE, the state prays:

1.    That the writ be denied, or, if granted, that all relief be denied;

2.    That the Court dismiss the Petition with prejudice.

DATED this 5th day of October, 2022.

*/s/ L. LaMont Anderson*
L. LaMONT ANDERSON
Deputy Attorney General
Chief, Capital Litigation Unit

## CERTIFICATE OF SERVICE

       I HEREBY CERTIFY That on or about the 5th day of October, 2022, I caused to be serviced a true and correct copy of the foregoing document by the method indicated below, postage prepaid where applicable, and addressed to the following:

Craig H. Durham               _____ U.S. Mail
Ferguson Durham, PLLC       _____ Hand Delivery
223 N. 6th Street, Suite 325     _____ Overnight Mail
Boise, ID  83702              _____ Facsimile
chd@fergusondurham.com       \_\_X\_\_ Electronic Court Filing


                                     /s/ *L. LaMont Anderson*
                                     L. LaMONT ANDERSON
                                   Deputy Attorney General
                                   Chief, Capital Litigation Unit