UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| KATHERINE LEA STANFIELD,<br><br>                    Petitioner,<br><br>vs.<br><br>JANELL CLEMENT,<br><br>                    Respondent. | Case No. 4:22-cv-00057-REP<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Petitioner Katherine Lea Stanfield ("Petitioner") filed a Petition for Writ of

Habeas Corpus challenging her state court conviction. (Dkt. 1.) Respondent Janelle

Clement ("Respondent") filed an Answer and Brief in Support of Dismissal (Dkt. 11),

and Petitioner filed a Reply. (Dkt. 17.)

All named parties have consented to the jurisdiction of a United States Magistrate

Judge to enter final orders in this case. (Dkt. 5.) *See* 28 U.S.C. § 636(c) and Fed. R. Civ.

P. 73.  Having reviewed the record, the Court finds that the facts and legal arguments are

adequately presented in the briefs and record and that oral argument is unnecessary. *See*

D. Idaho Loc. Civ. R. 7.1(d)(1)(B). Accordingly, the Court enters the following Order.

## BACKGROUND

Petitioner operated a daycare for her two grandsons, C.D. (age 8), J.D. (age 5)

(both sons of her daughter, Stacie Duvall), and W.F. (age 2), the son of Stacie's boyfriend,

Lance Wyatt. On December 11, 2009, Petitioner called 911 requesting medical assistance for W.F. (State's Lodging A-4 at 400-04.) Petitioner told dispatchers that "W.F. was unresponsive after hitting his head." (State's Lodging B-4 at 2.) W.F. was transported to the hospital, where testing, including two CT scans, indicated he had suffered severe head trauma. (*Id*.) Two days later, with worsening conditions and no hope of recovery, he was taken off life support and passed away. Police investigators questioned Petitioner and her two grandsons immediately after the incident, and several times later, as the investigation continued over the next several months. (*See id*.)

Dr. Charles Garrison, a pathologist, performed an autopsy on W.F. and preliminarily opined that W.F. suffered an axonal injury to the brain and died from either hypoxia or trauma. (*Id*.) Dr. Garrison requested a neuropathological consult to determine the cause of the axonal injury. Prior to receiving the neuropathological report, upon an evaluation of all the evidence, Dr. Garrison concluded that non-accidental trauma caused W.F.'s death. (*Id*.)

In September 2010, Petitioner was indicted by grand jury of first degree murder of W.F. by aggravated battery. Petitioner was arrested, arraigned, and appointed counsel in a state criminal case in the Fourth Judicial District Court in Ada County, Idaho. (*See* State's Lodging A-1.)

During trial preparation, the State hired Dr. Lucy Rorke-Adams, a neuropathologist, as an expert witness. (State's Lodging A-5 at 2076.) Dr. Rorke-Adams opined that the cause of W.F.'s death was abusive head trauma. She based her opinion, in

part, on dyed tissue sample slides prepared by Dr. Rorke-Adams' lab technician, at Dr. Rorke-Adams' direction.

The jury found Petitioner guilty of first-degree murder. State District Judge Ronald J. Wilper entered a Judgment of Conviction on August 22, 2012. (State's Lodging A-1 at 726-29.) Petitioner was sentenced to a unified life sentence with ten years fixed. (State's Lodging A-6 at 726-79.)

Petitioner filed a direct appeal and a post-conviction action in state court, but ultimately received no relief. (*See* State's Lodgings B-1 to B-5 and C-1 to F-6.) She brings three claims in her federal habeas corpus petition. (Dkt. 1.)

## REVIEW OF MERITS OF CLAIMS

### 1. Standards of Law

#### A. *Deferential Review*

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). When a petitioner challenges a state court criminal judgment, Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C. § 2254(d) limits relief to instances where the state court's adjudication of the petitioner's claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States", or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

MEMORANDUM DECISION AND ORDER - 3

When a petitioner contests the state appellate court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, then relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The Supreme Court

emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. at 102 (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

### B. *De Novo Review*

If the state appellate court did not decide a properly-asserted federal claim, if the state court's factual findings are unreasonable under § 2254(d)(2), or if an adequate excuse for the procedural default of a claim exists, then § 2254(d)(1) does not apply, and the federal district court reviews the claim de novo. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). In these instances, as in the pre-AEDPA era, a district court can draw from both United States Supreme Court as well as circuit precedent, limited only by the non-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989). Under de novo review, if the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle*, 313 F.3d at 1167.

2. **Discussion of Claim 1: Alleged Confrontation Clause Violation Stemming from Dr. Rorke-Adams' Testimony**

   A. *Nature of Claims and Facts*

Claim 1 is that Petitioner's Sixth Amendment Confrontation Clause rights were violated when Dr. Rorke-Adams, the State's neuropathologist expert, based her testimony, in part, on her review of tissue slides prepared by a lab technician, but the State did not present the lab technician at trial for cross-examination. (Dkt. 1 at 5.)

During the autopsy, W.F.'s brain and spinal cord were preserved for further testing. Dr. Rorke-Adams received W.F.'s medical records, the autopsy report, tissue samples on glass slides from the autopsy, as well as "actual remnants of the brain tissue" preserved in formaldehyde so that she "could look directly at the brain and spinal cord"; later, she requested additional tissue samples preserved in paraffin blocks so that one of her laboratory technicians could do some additional studies." (State's Lodging A-5 at 1992-95.)

As part of her examination, Dr. Rorke–Adams cut "slices" of W.F.'s brain from the paraffin-fixed samples. She gave those slices to a technician, who transferred the tissue to slides, labeled the slides, applied the [amyloid] stain that Dr. Rorke–Adams specified, and returned the slides to Dr. Rorke–Adams for her examination. (State's Lodgings A-5 at 1995-96; B-4 at 3 n.1.) The only documentation regarding the technician's work shows her receipt of the tissue, the stain that Dr. Rorke-Adams requested her to do, when she did it, and when she handed it back to Dr. Rorke-Adams. (*Id*. at 1998-99.) Nothing in the record shows that the documentation was certified, notarized, signed, or sworn to under

penalty of perjury. Nor was the document presented at trial for admission as an exhibit. (*See* State's Lodging A-3, Exhibit List, at ECF 250-52; State's Lodgings A-9, A-10.)[1]

At trial, when the prosecutor asked Dr. Rorke-Adams what the staining entailed, Petitioner objected to Dr. Rorke-Adams' testimony on foundation and confrontation grounds. (State's Lodging A-5 at 1996.) Upon further questioning, Dr. Rorke-Adams described the "routine procedure in every case" that involves "cut[ting] the tissue into small pieces so that the technician can prepare the slides"; and then the technician prepares the tissue "according to whatever technique we ask for the preparation." (*Id*. at 1996-97.) When the tissues arrived in her office, they were already labeled with W.F.'s name, they remained labeled, and she could tell the tissues came from W.F. (*Id*. at 1998.)

Dr. Rorke-Adams further explained that she filled out a request sheet that asked for a specific antibody to be applied to the tissue that was given to the technician with the tissue, and then explained she was able to determine that the stain was properly applied "[b]ecause there's always a control slide that goes with it." (*Id*. at 2000-02.) She views the control slide first to make sure "the technique was working so that [she] can rely then upon what [she's] looking at in the unknown slide." (*Id*. at 2002.) The trial court overruled Petitioner's objection.

---

[1] The state court record has been provided in electronic format. That means the original documents sometimes have different numbers than the scanned documents, such as the trial transcript, which appears as four original pages on one electronic page. For that reason, the Court uses "ECF" when referring to the electronic page numbers, and plain numbers without a designation for referring to original document numbers.

**MEMORANDUM DECISION AND ORDER - 7**

During direct examination, Dr. Rorke-Adams explained that, after reviewing all the material provided and examining the tissues both grossly and microscopically, she prepared a report detailing her findings. (*Id*. at 2003-04.) Dr. Rorke-Adams then testified about the contents of her report, which included a discussion of the clinical history, findings that she made based upon a "gross description" that is "basically a description of what the pathologist sees when examining the brain," a discussion of the two CT scans, and a discussion of "respirator brain." (*Id*. at 2004-22.)

Dr. Rorke-Adams discussed how the amyloid staining of the tissue sample completed by her lab technician "help[ed] [her] recognize damage to axons," which "are the fibers that are a product of every single nerve cell that we have in our body, and they're the wires that I mentioned before that connect with the other nerve cells in the nervous system. So, in certain kinds of traumatic injury, there's damage to these axons." (*Id*. at 2022-23.) "Axonal injury in certain areas tells us what forces may have been involved in producing the trauma to the brain," and "occurs right at the time of the trauma." (*Id*. at 2024-26.) Axonal injury in the corpus callosum or brain stem "is classical for angular acceleration injury" and is "quite uncommon," but was found in W.F.'s spinal cord. (*Id*. at 2032-34.) Ultimately, Dr. Rorke-Adams made six diagnoses, only one of which involved any information derived from staining completed by her technician— "primary acute deep cerebral, cerebral brainstem and spinal cord contusions/laceration with axonal injury, secondary to angular acceleration forces." (*Id*. at 2056.) Dr. Rorke-Adams opined that W.F. died of "nonaccidental trauma." (*Id*. at 2060.)

**B.  *State Court Decision***

Petitioner contends that the technician's labeling of the slides is an "assertion" that they "contained W.F.'s tissue, and that, by returning the slides to Dr. Rorke-Adams without any notations, 'asserted' that the proper chemicals had been applied to the tissue samples in accordance with her instructions." (State's Lodgings B-4 at 4.) Petitioner argued on direct appeal that "these assertions are testimonial and that Dr. Rorke–Adams introduced them for their truth." (*Id*.) Thus, "the Confrontation Clause required that the State produce the testimony of the laboratory technician in addition to that of Dr. Rorke-Adams," because without the lab technician's testimony, "Dr. Rorke-Adams' opinions and conclusions were not relevant or reliable and should not have been presented to the jury." (*Id*.)

Relevant testimony at trial was as follows:

> Q.    And the technician that put the stain on the tissues, does she write any reports?
>
> A. (Rorke-Adams)   No. She – we write the report. She has documentation to the fact that she received the tissue, the stain that we requested her to do, and she notes when she did it, and then when she handed it back to us. Those are the only pieces of documentation. This is the standard procedures in the laboratory for every case.
>
> And so the label of the material is attached to the material. It remains with the material. Then the slides are prepared by the technician and the slides are labeled with the same number that was attached to that specimen so we know that Specimen 500 came from John Smith. And so we evaluate –we evaluate it, write it, write a report, and that report goes into the permanent record.

(State's Lodging A-5 at 1998-99.)

**MEMORANDUM DECISION AND ORDER - 9**

Dr. Rorke-Adams also testified that she knew the proper test was done because they use a control slide, "which means that another piece of tissue that was known to contain this particular antigen that we're interested in has been used to corroborate the validity of the stain from the unknown slide." (*Id*. at 2002.) She explained: "So we look at the control slide first to make certain that the technique was working so that we can rely then upon what we're looking at in the unknown slide." (*Id*.)

To evaluate this claim, the Idaho Supreme Court undertook a comprehensive review of Confrontation Clause jurisprudence, including United States Supreme Court precedent, Idaho case law, and cases from different state and federal jurisdictions. Important to federal habeas corpus review, the Idaho Supreme Court cited, discussed, and applied United States Supreme Court Confrontation Clause cases including *Crawford v. Washington*, 541 U.S. 36 (2004); *Davis v. Washington*, 547 U.S. 813 (2006); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011); and *Williams v. Illinois*, 567 U.S. 50 (2012) (a plurality opinion), *abrogated by Smith v. Arizona*, 602 U.S. 779 (2024). (*See* State's Lodging B-4.)

The Idaho Supreme Court reasoned that the current status of the law permitted the testimony of an expert witness "who arrives at an independent conclusion" to testify under the Confrontation Clause, "even where other non-testifying analysts have provided underlying data or conducted portions of the testing." (*Id*. at 13.) The Idaho Supreme Court agreed with cases holding that testifying expert witnesses cannot simply act as "conduits" to provide underlying scientific information or technical opinions of others if the testifying experts do not provide any independent expert opinion of their own. (*Id*. at

14.) The Idaho Supreme Court reasoned that, where the testifying expert's opinion is an "original product" that can be readily "tested through cross-examination," the expert may testify as to underlying testing upon which the expert's testimony is based. (*Id*.) (citations and punctuation omitted).

Accordingly, the Idaho Supreme Court focused its "attention on the question whether the primary purpose of the lab technician's act of labeling the slides and the implicit assertion that the proper stain was applied was intended to establish some fact at trial and whether Dr. Rorke-Adams served as a mere conduit." (*Id*. at 14-15.) Applying these principles, the Idaho Supreme Court concluded:

> Dr. Rorke-Adams had personal knowledge that the slides were stained correctly based on her comparison of the slides with the control slide. Based upon this testimony, Dr. Rorke-Adams did not rely upon an implied assertion by the technician that the slide had been properly prepared. Therefore, the only remaining implied assertion is that the labeling of the slides represented that the slides contained W.F.'s tissue.
> ….
> The technician did not make any conclusions or factual findings as to any issue to be decided at trial when she labeled the slides and the technician's assertion had no probative value as to Stanfield's guilt or innocence. Rather, the act of labeling was manifestly for a laboratory—rather than trial— purpose: to identify the samples while they awaited Dr. Rorke-Adams' examination. Further, while assertions need not be contained in formalized affidavits or admitted at trial to be testimonial, the fact that the technician did not prepare a report suggests that her purpose in labeling the slides was not to establish any fact at trial. The only testimony the technician could have supplied would be to attest that she did not alter the integrity or identity of the tissue samples. This is akin to the type of assertion made by any person whose name appears in a chain of custody.
> ….

**MEMORANDUM DECISION AND ORDER - 11**

> [T]he technician's assertions were not admitted as direct
> proof of an element of the crime; rather, they were admitted
> as foundation for the introduction of the results of Dr. Rorke-
> Adams' testimony regarding her examination of the samples
> and the conclusions she drew therefrom, i.e., that W.F. died
> from non-accidental trauma. These findings and conclusions
> were derived from Dr. Rorke-Adams' personal examination
> and observations of the slides. Unlike the analyst in
> *Navarette*,[2] the technician in this case made no independent
> conclusions and the labeling did not prove any fact relevant to
> Stanfield's guilt or innocence.
>
> For these reasons, we hold that there was no Confrontation
> Clause violation because the technician's assertions were not
> made for an evidentiary purpose and thus were not
> testimonial.

(*Id*. at 16-17 (internal citations omitted; footnote added.))

### C. *Analysis*

The Idaho Supreme Court properly identified clearly-established law interpreting

the Confrontation Clause that is applicable to lab technician test results used as a basis for

expert witness testimony in criminal cases. The Sixth Amendment right to confront and

cross-examine adverse witnesses "is implicit in the constitutional right of confrontation,

and helps assure the 'accuracy of the truth-determining process.'" *Chambers v.*

*Mississippi*, 410 U.S. 284 (1973) (citation omitted). "[T]he Confrontation Clause reflects

---

[2] In *State v. Navarette*, 294 P.3d 435 (N.M. 2013), the testifying expert relied on the findings of another analyst—who concluded that there was gunpowder residue on the victim—to determine how close the shooter was to the victim. *Id*. at 436-37. The court held that the underlying analyst's findings were testimonial because there were no "objective markers that any third party can examine in order to express an independent opinion." *Id*. at 438-439. In Petitioner's case, the Idaho Supreme Court noted that, unlike *Navarette*, "when an expert independently evaluates objective raw data obtained from an analyst, and exercises his or her own judgment in reaching a conclusion, the expert is not a conduit for the analyst's conclusion." (State's Lodging B-5 at 14 (citing *United States v. Summers*, 666 F.3d 192, 201-202 (4th Cir. 2011)).

a preference for face-to-face confrontation at trial, a preference that must occasionally give way to considerations of public policy and the necessities of the case." *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (internal citations and punctuation omitted).

The law is clearly established that, to be subject to the Confrontation Clause, an out-of-court lab test and analysis must be both testimonial and hearsay. Admission of *testimonial hearsay* is prohibited by the Confrontation Clause, *see Davis*, 547 U.S. at 823, unless (1) the declarant is unavailable to testify and (2) the accused had a prior opportunity to cross-examine the witness. *Crawford*, 541 U.S. at 68 (the Clause "applies to those who 'bear testimony'" (internal citation omitted)).

*Testimonial* evidence has been defined as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." (*Id.* at 51.) *Hearsay* evidence is that offered "to prove the truth of the matter asserted." *See Anderson v. United States*, 417 U.S. 211, 219 (1974).

At the time the Idaho Supreme Court performed its Confrontation Clause survey, *Williams v. Illinois*, 567 U.S. 50 (2012), was the United States Supreme Court's most recent ruling. The Idaho Supreme Court found the *Williams* plurality holding to be restricted to the unique facts of that case: a testifying expert relying on past DNA results from a DNA bank. The holding of *Williams* can be gleaned from four Justices (Alito, Roberts, Kennedy, and Breyer) in the plurality opinion, plus one Justice's concurrence (Thomas). The four Justices concluded that a defendant's right to confrontation was not violated when the prosecution's expert witness's testimony relies on a DNA profile that the expert did not personally prepare. *Id.* at 81-82. Justice Thomas agreed with the

plurality that the disclosure of the DNA laboratory's out-of-court statements through expert testimony did not violate the Confrontation Clause. *Williams*, 567 U.S. at 103 (Thomas, J., concurring).

There was no majority agreement on the reasoning behind the holding.[3] Justice Kagan observed: "I call Justice ALITO's opinion 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication." *Id*.

Five justices did agree on the "hearsay" issue, but whether a stated opinion on the "hearsay" issue constitutes the *holding* of each opinion is debatable. As noted above, clearly-established law for AEDPA purposes can come only from the holdings (as opposed to dicta) of United States Supreme Court precedent. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). In *Panetti v. Quarterman*, 551 U.S. 930, 949 (2007), the Supreme Court instructed the lower federal courts that, [w]hen there is no majority opinion, the narrower holding controls." *Panetti* further instructed that a combination of a majority of Justices' "opinions" constitutes "'clearly established' governing law for AEDPA purposes."[4]

---

[3] Justice Thomas clarified: "I reach this conclusion, however, solely because Cellmark's statements lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." (*Id*. (internal quotation marks omitted).) Justice Kagan observed: "The Court today disagrees, though it cannot settle on a reason why." *Id*. at 120.

[4] In *Panetti*, the United States Supreme Court clarified that a plurality opinion can be "clearly established law" under 28 U.S.C § 2254, by explaining how that principle worked in *Ford v. Wainwright*, 477 U.S. 399 (1986):

A *Panetti* analysis of *Williams* would combine Justice Kagan's dissent (joined by Justices Scalia, Ginsburg, and Sotomayor) with Justice Thomas's concurrence, yielding clearly established law that "admission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it except assess its truth and so the credibility of the conclusion it serves to buttress." *Id*. at 127. That means it is clearly established that underlying scientific testing and results are always offered for the truth of the matter, and therefore always *hearsay.*

The remaining unanswered question is under what circumstances are scientific testing and results *testimonial* (as in *Melendez-Diaz* and *Bullcoming*), and when are they not testimonial (as the Justices could not agree upon in *Williams*)? *Non-testimonial* statements do not implicate the Confrontation Clause because they are not made primarily for purposes of investigation or prosecution. *Moses v. Payne*, 555 F.3d 742, 754 (9th Cir. 2009).[5]

---

> In *Ford*, Justice Powell stated in a concurrence to the four-justice plurality opinion that prisoners are insane for the purposes of execution if they are "unaware of the punishment they are about to suffer and why they are to suffer it." *Id*. at 422, 106 S.Ct. 2595. Powell also opined that a state may, consistent with due process, presume a prisoner who was competent to stand trial is sane at the time of execution, and "may require a substantial threshold showing of insanity merely to trigger the hearing process." *Id*. at 426, 106 S.Ct. 2595. Powell's concurrence, needed to create a majority, became the controlling opinion in *Ford* and "constitutes 'clearly established' law for purposes of § 2554."

*Id*. at 949.

[5] When no such primary purpose exists, the statement is nontestimonial and its admissibility is governed by state and federal rules of evidence, not the Confrontation Clause. *Davis*, 547 U.S. at 822 (citations omitted).

**MEMORANDUM DECISION AND ORDER - 15**

A decade before the Idaho Supreme Court considered Petitioner's confrontation issue, *Crawford* gave examples of "testimonial" statements: (1) statements made in prior testimony; (2) "[s]tatements taken by police officers in the course of interrogations"; (3) "formalized" statements, e.g., affidavits, depositions, and confessions; (4) "pretrial statements that declarants would reasonably expect to be used prosecutorially"; and (5) "statements that were made under circumstances which would lead an objective witness to reasonably believe that the statement would be available for use at a later trial." 541 U.S. at 51-52 (internal quotation marks omitted). Whether a statement is testimonial is determined by looking at the statement's primary purpose and its similarities to traditional testimony. *See Davis*, 547 U.S. at 822. A statement is testimonial when "the circumstances objectively indicate that ... the primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution." *Id*. at 822.

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), prosecutors introduced written, notarized "certificates of analysis" from lab technicians stating that lab tests had identified a substance seized from the defendant as cocaine, in a criminal action charging the defendant with trafficking in cocaine. *Id*. at 308. The lab technicians did not appear at trial; the defendant objected to the certificates on confrontation grounds. The Court determined that the lab tests were testimonial; thus, defendant had a right to cross-examine the lab analysts who prepared the certificates. The Court held: "The Sixth Amendment does not permit the prosecution to prove its case via ex parte out-of-court affidavits, and the admission of such evidence against *Melendez–Diaz* was error." *Id*. at 329.

**MEMORANDUM DECISION AND ORDER - 16**

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court relied on *Melendez-Diaz* to hold that a State could not introduce a lab analyst's written findings through the testimony of a substitute analyst who had not participated in the lab testing and analysis. The evidence at issue in *Bullcoming* was described as follows:

> The report was signed by the nontestifying analyst who had authored it, stating, "I certify that I followed the procedures set out on the reverse of this report, and the statements in this block are correct. The concentration of alcohol in this sample is based on the grams of alcohol in one hundred milliliters of blood." App. in *Bullcoming*, O.T. 2010, No. 09–10876, p. 62. Critically, the report was introduced at trial for the substantive purpose of proving the truth of the matter asserted by its out-of-court author—namely, that the defendant had a blood-alcohol level of 0.21. This was the central fact in question at the defendant's trial, and it was dispositive of his guilt.

*Williams*, 567 U.S. at 66–67.

Under these facts, the *Bullcoming* Court determined that "surrogate testimony" contravenes the Confrontation Clause. *Id*. at 661. Surrogate testimony could not convey what the original analyst knew or observed about the events stated in the certificate, nor "could it expose any lapses or lies on the certifying analysist's part." *Id*. The *Bullcoming* Court concluded: "The accused's right is to be confronted with the analyst who made the certification." *Id*. at 652.

In the next case, *Williams*, the United States Supreme Court recognized that Justice Sotomayor's *Bullcoming* concurrence foreshadowed the question to be decided in *Williams*:

Justice SOTOMAYOR highlighted the importance of the fact that the *forensic report had been admitted into evidence* for the purpose of proving the truth of the matter it asserted. She emphasized that "this [was] not a case in which an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence." 564 U.S., at ——, 131 S.Ct., at 2722 (opinion concurring in part) (citing Fed. Rule Evid. 703). "We would face a different question," she observed, "if asked to determine the constitutionality *of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.*" *Id.*, at ——, 131 S.Ct., at 2722. We now confront that question.

567 U.S. at 67 (emphasis added).

In *Williams*, the Court considered a case where the State attempted to present the same type of out-of-court evidence rejected in *Bullcoming*, but dressed up a bit differently—a substitute lab technician gave his *own* expert opinion based on the original-now-absent lab technician's testing and findings. The state court held that the testimony did not implicate the Confrontation Clause because the absent lab technician's statements were introduced not for their truth, but to explain the basis for the testifying expert's opinion. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

*Williams* did not produce a holding that applies to the legal analysis of whether a lab test and result is *testimonial*. The clearly established law on whether scientific testing evidence is testimonial, then, comes from the earlier cases.[6]

Under *Crawford*, *Davis*, and *Melendez-Diaz*, Rorke-Adams' underlying lab testing information—asserted as true by the lab technician by her act of submitting it as a completed task to Rorke-Adams—*does* appear to be testimonial. In fact, in *Smith* (2024) (*see* Footnote 5), the parties relied on the same body of law at issue here, and "[t]he question presented in Smith's petition for certiorari did not ask whether [the] out-of-court statements were testimonial…. Instead, it took as a given that they were." *See Smith*, 602 U.S. at 801.

From all of this prior precedent, several rules emerge. Assuming that, in 2014, the *Williams* conglomeration of opinions clearly established that out-of-court lab work results are *hearsay*, and assuming that *Crawford*'s progeny (prior to *Williams*) clearly established that out-of-court lab work results ordered for investigation or prosecution purposes in the same case are *testimonial* (even though by 2024, that was still unresolved by the United States Supreme Court), the Court concludes that Petitioner has the better argument here— the lab results underlying Dr. Rorke-Adams' expert testimony are subject to the Confrontation Clause. Dr. Rorke-Adams relied on testimonial hearsay as the basis for her

---

[6] According to the United States Supreme Court in *Smith v. Arizona*, 602 U.S. 779 (2024), a more recent Confrontation Clause case that cannot be considered in this case, other than to show the trend of the law, the factors a court relies upon to come to a decision on the testimonial prong of a Confrontation Clause analysis still remain unresolved and/or are highly case-specific and discretionary.

**MEMORANDUM DECISION AND ORDER - 19**

opinion; therefore, the State was required to produce the lab technician as a witness to be confronted at trial.

But, the test to prevail on habeas corpus review is not so simple, because habeas corpus is not direct appeal. A deferential standard has been erected by federal statute to corral federal habeas courts from interfering with *reasonable* state court decisions. A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of United States Supreme Court precedent must be *objectively* unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. at 694.

The "unreasonable application" standard—whether "fairminded jurists could disagree" with the state court decision—is somewhat difficult to comprehend. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). More recent decisions restate the standard of law in more understandable language, such as, "The prisoner must show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (citing *Richter*, 562 U.S. at 103). This means that, if *any* fairminded jurist could take a different view from the way the state appellate court resolved the claim, habeas corpus relief is not warranted. *Id*. at 525. If *all* fairminded jurists would agree that resolution of the claim was "an error well understood and comprehended in existing law," then relief under § 2254(d)(2) is warranted. *Parker v. Matthews*, 567 U.S. 37, 47 (2012) (citation omitted).

**MEMORANDUM DECISION AND ORDER - 20**

In 2014, there was tremendous disagreement as to what constituted testimonial hearsay. In *Williams*, the latest in the line of cases following *Crawford*, several Justices commented on the lack of clarity in the law on Petitioner's issue here. Justice Breyer wrote in his concurring opinion:

> This case raises a question that I believe neither the plurality nor the dissent answers adequately: How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians? In this context, what, if any, are the outer limits of the "testimonial statements" rule set forth in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)? Because I believe the question difficult, important, and not squarely addressed either today or in our earlier opinions, and because I believe additional briefing would help us find a proper, generally applicable answer, I would set this case for reargument.

567 U.S. at 86 (Breyer, J., concurring).

Also in *Williams*, Justice Kagan observed: the "five Justices who control the outcome of today's case agree on very little" and have "left significant confusion in their wake." *Id*. at 141 (Kagan, J., dissenting). Justice Kagan continued:

> What comes out of four Justices' desire to limit *Melendez-Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings is – to be frank – who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority.

*Id*.

**MEMORANDUM DECISION AND ORDER - 21**

Even though this Court concludes that the Idaho Supreme Court was erroneous in its decision that the lab technician's assertions were non-testimonial, habeas relief is not warranted. Based on the unsettled nature of the law on what is testimonial, the Court cannot conclude that the Idaho Supreme Court's decision was *objectively unreasonable* to the extent that the decision is so obviously wrong that its error lies beyond any possibility for fairminded disagreement. The law is comprised of multiple paths to arrive at the same destination (whether testing results hearsay is testimonial), showing that fairminded jurists could (and do) differ from the Idaho Supreme Court in the proper resolution of this issue. For that reason, habeas corpus relief is not warranted. Petitioner has a very good argument that the underlying testing results from the lab technician are testimonial, but she cannot prevail under the objectively unreasonable requirement of the habeas corpus standard.

Supporting a conclusion that the Idaho Supreme Court opinion is not objectively unreasonable is Justice Sotomayor's concurring opinion in *Bullcoming*–where she pointed out that the holding of that case did not address a factual scenario like Petitioner's, and she pointed out why a factual scenario like Petitioner's may even raise a different legal question, but not a Confrontation Clause question:

> [T]his is not a case in which *an expert witness was asked for his independent opinion about underlying testimonial reports that were not themselves admitted into evidence*. *See* Fed. Rule Evid. 703 (explaining that facts or data of a type upon which experts in the field would reasonably rely in forming an opinion need not be admissible in order for the expert's opinion based on the facts and data to be admitted).

> As the Court notes, *ante*, at 2715 – 2716, the State does not assert that Razatos offered an independent, expert opinion about Bullcoming's blood alcohol concentration. Rather, the State explains, "[a]side from reading a report that was introduced as an exhibit, Mr. Razatos offered no opinion about Petitioner's blood alcohol content ... ." Brief for Respondent 58, n. 15 (citation omitted). Here the State offered the BAC report, including Caylor's testimonial statements, into evidence. *We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence.*

564 U.S. at 673 (emphasis added). The Idaho Supreme Court relied on this statement in its opinion. (*See* State's Lodging B-4 at 9.) It distinguished the facts of Petitioner's case from precedent as follows:

> The overriding principle that we glean from *Melendez-Diaz* and *Bullcoming* is that introduction of reports by non-testifying analysts violates the defendant's right of confrontation when they are "for the purpose of establishing or proving some fact at trial," *Melendez-Diaz,* 557 U.S. at 324, or are "affirmation[s] made for the purpose of establishing or proving some fact in a criminal proceeding." *Bullcoming,* 131 S.Ct. at 2716 (alteration in original; internal quotation omitted). In the present case, the challenged evidence served as foundation for the introduction of Dr. Rorke-Adams' testimony rather than direct evidence of a fact pointing toward Stanfield's guilt. Thus, we do not view these decisions as dictating the result of this appeal.

*Id*.

The Idaho Supreme Court also distinguished Petitioner's facts from *Williams*, where no Confrontation Clause violation was found. Several of the plurality's reasons why the DNA evidence was not testimonial support the Idaho Supreme Court's conclusion; several do not.

**MEMORANDUM DECISION AND ORDER - 23**

One significant reason mentioned by both the *Williams* plurality and dissent was that the *nature of matching DNA evidence* does not requiring confrontation clause protections—which distinguishes it from Petitioner's case:

> [T]he knowledge that defects in a DNA profile may often be detected from the profile itself provides a further safeguard. In this case, for example, [the expert witness relying on the DNA test] testified that she would have been able to tell from the profile if the sample used by Cellmark had been degraded prior to testing. As noted above, moreover, there is no real chance that "sample contamination, sample switching, mislabeling, [or] fraud" could have led Cellmark to produce a DNA profile that falsely matched petitioner. *Post*, at 2275 (KAGAN, J., dissenting). At the time of the testing, petitioner had not yet been identified as a suspect, and there is no suggestion that anyone at Cellmark had a sample of his DNA to swap in by malice or mistake. And given the complexity of the DNA molecule, it is inconceivable that shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim. The prospect is beyond fanciful.

567 U.S. at 85–86.

In addition, Petitioner's facts do not meet Justice Thomas's "formality and solemnity" requirements for testimonial evidence. (*See id*. at 9-10.) "But," the Idaho Supreme Court observed, "Justice Kagan, writing for the four dissenting justices, rejected the plurality's accusatory requirement, as well as Justice Thomas's formality requirement, adhering to the view that forensic reports are testimonial based entirely on the primary purpose test." (*Id*. at 10-11 (citations omitted).) The Idaho Supreme Court also noted that, in Justice Breyer's concurrence, he concluded that out-of-court testing results "fall outside application of the Confrontation Clause." (*Id*. at 11.)

The Justices of the United States Supreme Court remain divided on an analytical framework for determining whether scientific laboratory work is testimonial. On that issue, the Idaho Supreme Court adopted the reasonable viewpoint that, "[b]ecause no position received support from a majority of the justices, *Williams* does not provide us a governing legal principle and this Court views the decision as limited to the unique set of facts presented in that case. *See e.g., United States v. James*, 712 F.3d 79, 95 (2nd Cir.2013); *Jenkins v. United States*, 75 A.3d 174, 176 (D.C. 2013) ("the splintered decision in *Williams* ... creates no new rule of law that we can apply in this case."). (State's Lodging B-4 at 11 (footnote omitted).)

Petitioner's facts are different enough from United States Supreme Court precedent to support a conclusion that a fairminded jurist could disagree with the Idaho Supreme Court's conclusion on the Confrontation Clause question, given the murky state of the law in 2014 (and today). As the courts concluded in *James* and *Jenkins*, there is a good argument that there is no clearly-established law on the testimonial prong of the Confrontation Clause analysis. Dr. Rorke-Adams had her own opinion and was a traditional expert witness. Her lab technician's work seems to fit within the framework of "testimonial statements" set forth by *Crawford, see* 541 U.S. at 51-52, *except* that it was not formal, but instead an "assertion" made by handing back dyed tissue sample slides marked "completed." These are the facts that Justice Sotomayor said were not addressed in *Bullcoming* (2011), and that should have been but were not addressed in *Williams* (2012). What is and is not testimonial still an open question in *Smith* (2024).

Facing the same quandary as here, the *James* Court "distill[ed] from this pre-*Williams* case law the principle that a laboratory analysis is testimonial if the circumstances under which the analysis was prepared, viewed objectively, establish that the primary purpose of a reasonable analyst in the declarant's position would have been to create a record for use at a later criminal trial." 712 F.3d at 94. The *James* Court went on to note:

> The question then becomes whether the Court's later decision in *Williams* changed that rule. We agree with Justice Kagan that this problem is intractable. No single rationale disposing of the *Williams* case enjoys the support of a majority of the Justices.

*Id*. at 95.

Similarly, in *Jenkins*, the court relied on Justice Kagan's comment about the effect of the *Williams* splintered opinions on whether a "clear rule" on the "testimonial" factor exists:

> Before today's decision, a prosecutor wishing to admit the results of forensic testing had to produce the technician responsible for the analysis. That was the result of not one, but two decisions this Court issued in the last three years. But that clear rule is clear no longer.

75 A.3d at 186. The *Jenkins* Court decided that a holding could not be gleaned from the opinions in that case, given that "the two opinions of the Justices who concurred in the judgment in *Williams* lack the necessary common denominator" with the plurality opinion. *Id*. at 187. Therefore, in a similar post-*Williams* case, that same court "found it unnecessary to determine any precise holding in *Williams*, extracting instead 'an intermediate position.'" *Id*. at 187.

**MEMORANDUM DECISION AND ORDER - 26**

The lack of a definite analytical framework for determining what is testimonial suggests that the Idaho Supreme Court's decision is within the range of objective reasonableness. The decision is certainly not one that departs from the various reasonable factors that pre- and post-*Williams* courts considered in making a determination about whether out-of-court lab work was testimonial and subject to the Confrontation Clause, or was merely an evidentiary issue to be addressed by the Federal Rules of Evidence.

Based on all of the foregoing, the Court agrees with Respondent that "there is no Supreme Court precedent that has addressed whether a lab technician who merely completes an assigned task by staining tissue on slides is testimonial for purposes of determining whether there is a Confrontation Clause violation." (Dkt. 11 at 42.) Comparing the facts in Petitioner's case to the facts in existing Sixth Amendment case law shows that, even if the Idaho Supreme Court's application of the Confrontation Clause Crawford factors was erroneous, it was not objectively unreasonable, because the law on what is "testimonial" was unsettled in 2014 and remains unsettled today. As a result, Claim 1 is subject to denial and dismissal with prejudice on grounds that the Idaho Supreme Court' s decision is not objectively unreasonable.

### 3.  Claim 2: Alleged Jury Instruction Error

####    A. *Facts*

Petitioner was convicted under a felony-murder type of statute, not a traditional murder statute, with different elements, including a different mens rea element. Claim 2 asserts that Petitioner was denied her Sixth Amendment right to a fair trial and her Fourteenth Amendment right to due process because the jury instructions allegedly failed

to "require the jury to find that [she] had specific intent to cause an aggravated battery before convicting her of first degree murder," and that the definition of battery under Idaho Code § 18-903 "elevates a battery to murder without an accompanying mental state to commit an underlying felony." (Dkt. 1 at 6-7.)

The Idaho homicide statutory scheme includes the following statutes. In pertinent part, Idaho Code § 18-4001 defines murder as "the unlawful killing of a human being … with malice aforethought." Idaho Code § 18-4002 provides: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

Idaho Code § 18-4003, entitled "Degrees of murder," sets forth six distinct types of homicide that constitute first degree murder. Petitioner was convicted of W.F.'s death under subsection (d), which is Idaho's felony murder cause of action. The felony murder subsection lists nine categories of predicate felony crimes that can be predicate crimes to a first degree felony murder charge, including these: "Any murder committed in the perpetration of, or attempt to perpetrate, aggravated battery on a child under twelve (12) years of age, arson, rape, robbery, burglary, kidnapping or mayhem." *See* Idaho Code § 18-4003(d).

After much discussion among the judge, defense counsel, and the prosecutors in crafting the jury instructions in Petitioner's case (*see* State's Lodging A-6 at 4311-58), the jury was instructed as follows.

**MEMORANDUM DECISION AND ORDER - 28**

Instruction No. 22 provided:

> In order for the defendant to be guilty of First Degree Murder, the state must prove each of the following:
>
> 1. On or about December 11, 2009,
> 2. in the State of Idaho,
> 3. the defendant Katherine Lea Stanfield committed an aggravated battery on a child, [W.F.], under twelve (12) years of age, and
> 4. in doing so, caused the death of [W.F.]
>
> If any of the above has not been proven beyond a reasonable doubt, you must find the defendant not guilty. If each of the above has been proven beyond a reasonable doubt, then you must find the defendant guilty.

(State's Lodging A-3 at ECF 200.)

Instruction No. 20 provided: "An 'aggravated battery' is a battery which causes great bodily harm." (*Id*. at ECF 198.) Instruction No. 21 provided: "Murder is the killing of a human being without legal justification or excuse in the perpetration of, or attempt to perpetrate, an aggravated battery on a child under twelve (12) years of age." (*Id*. at ECF 199.) Instruction No. 22A provided: The state does not have to prove that the defendant intended to kill [W.F.], but the state must prove that during the perpetration or attempt to perpetrate an aggravated battery on a child under twelve (12) years of age, the defendant killed [W.F.]. (*Id*. at ECF 201.) Instruction 23 provided: "An act is "willful" or done "willfully" when done on purpose. One can act willfully without intending to violate the law, to injure another, or to acquire any advantage." (*Id*. at ECF 202.)

Instruction 25 provided: "In crimes, such as the one charged, there must exist a union or joint operation of act or conduct and criminal intent. To constitute criminal

intent[,] it is not necessary that there should exist an intent to violate the law. Where a person intentionally does that which the law declares to be a crime, she is acting with criminal intent, even though she may not know that her act or conduct is unlawful." (*Id.* at ECF 204.)

Petitioner contends that first degree murder by aggravated battery on a child under twelve is a specific intent crime, and, therefore, "the jury was required to find that she specifically intended to cause great bodily harm to W.F., as opposed to finding that she committed battery, and in doing so, unintentionally caused great bodily harm." (State's Lodging B-4 at 20-21.) For *general intent*, the prosecution must prove only that the defendant intended to do the act in question, whereas to prove *specific intent*, the prosecution must prove that the defendants intended to bring about a specific consequence through their actions, or that they performed the action with a wrongful purpose.

On  direct appeal, Petitioner pointed out that three of the nine felony predicate crimes are general intent crimes; three can be either general or specific intent crimes (including aggravated battery); and three are always specific intent crimes. (State's Lodging B-1 at ECF 38.) She argued that Idaho case law shows that "the State must prove the defendant's specific intent to commit the underlying felony to apply to offenses that would ordinarily be general intent crimes." (*Id.* at ECF 39.) She also asserted: "With respect to the first prong, the district court's failure to instruct on all elements of the offense of first degree murder violated Ms. Stanfield's constitutional rights to due process and to a jury trial, as guaranteed under both the United States and Idaho Constitutions,"

citing *Neder v. United States*, 527 U.S. 1, 9-10, 19 (1999) ("where the defendant

contested the omitted element and raised evidence sufficient to support a contrary finding

... [the court] should not find the error harmless."). (*See id*. at ECF 40.)

**B.  *State Court Decision***

In rejecting this claim, the Idaho Supreme Court simply referred the parties to the

reasoning in its decision in a different case it had recently decided, *State v. Carver*, 155

Idaho 489, 314 P.3d 171 (2013). "In *Carver*, this Court addressed an identical claim and

held that 'the district court correctly instructed the jury that Defendant would be guilty of

first degree murder if he committed a battery upon the child which resulted in great

bodily harm, from which the child died.'" (State's Lodging B-4 at 21 (citation omitted).)

**C.  *Analysis***

In *Carver*, the defendant (also accused of murder by aggravated battery upon a

child under twelve), did not object to the jury instruction setting forth the elements of the

claim at trial, and, therefore, the Idaho Supreme Court reviewed the alleged error under

is fundamental error doctrine. 314 P.2d at 175. The same is true in Petitioner's case; no

objection was made.

Mr. Carver asserted, "in order to convict him of felony murder, 'not only did the

jury have to find that Mr. Carver had the requisite mental state to commit an aggravated

battery, [but the jury] also had to find that he had the specific intent to cause great bodily

harm to [the child].'" *Id*. (bracketed alteration in original).

The Idaho Supreme Court rejected Mr. Carver's argument:

> As Defendant conceded during oral argument, the crime of aggravated battery does not require any intent to cause great bodily harm. A battery becomes an aggravated battery if in committing a battery the person causes great bodily harm. I.C. § 18–907(1)(a). A battery becomes aggravated battery because of the harm caused, not because of the intent to cause that harm. Here, the district court correctly instructed the jury that Defendant would be guilty of first degree murder if he committed a battery upon the child which resulted in great bodily harm, from which the child died. Instructing the jury that Defendant had to have intended to cause great bodily harm to the child would not have been an accurate statement of the law.

*Id*. at 176.

The Idaho felony-murder statutory scheme is strict, but it is intended to be a protection against all types of battery that may inflict death upon vulnerable child victims, regardless whether the perpetrators intend or foresee that their battery could be fatal when the victim is a child. Respondent correctly argues that the Idaho legislature has intentionally set forth a felony murder scheme that exempts the killing of children via battery from the requirement of premeditation. The legislature's intent was to protect children from battery resulting in unintended death. The "Statement of Purpose" for the 1991 amendment to the statute provides:

> The purpose of this bill is to allow for the prosecution for the crime of first degree murder of someone who inflicts great bodily harm on a child under twelve years old, or who uses a deadly weapon on such a child, if the child dies as a result. Under current law, the state would have to prove that a defendant had a premeditated intent to kill the child, or that the child was tortured. This bill will serve as a deterrent to the use of deadly force upon the most vulnerable members of our

society, and will assure that perpetrators of such crimes will
face the most severe punishment available under the law.

S.B. 1040, 51st Leg., 1st Reg. Sess., 1991 Idaho Laws Ch. 227.

State legislatures possess leeway to "define the conduct that is considered criminal under state law." *Bieganski v. Shinn*, No. CV-21-01684-PHX-DWL, 2023 WL 4862681, at *8 (D. Ariz. July 31, 2023). To the extent that a state appellate court's approach to interpreting a state criminal statutory scheme does not violate due process standards, it may choose to apply any objectively reasonable approach, notwithstanding there may be "an array of intuitively appealing reasons" that other reasonable jurors might choose instead. *Id*.

The Idaho appellate courts have reviewed the due process issue at hand and have resolved it in favor of upholding the statute's mens rea scheme:

> The requirement of the state to prove the mens rea element of a crime beyond a reasonable doubt is grounded in the constitutional guarantee of due process. *State v. McDougall*, 113 Idaho 900, 902, 749 P.2d 1025, 1027 (Ct. App. 1988). The felony murder rule does not include any element of intent to kill or injure the victim. A defendant who participates in a predicate felony can be held liable for the death of any person killed during the commission of the felony, regardless of the individual defendant's intent that a death occur. *State v. Windsor*, 110 Idaho 410, 419, 716 P.2d 1182, 1191 (1985). Therefore, so long as the state is required to, and does, prove beyond a reasonable doubt that the defendant had the general intent to commit the aggravated battery that resulted in the death of a child under twelve years of age, due process is satisfied.

*State v. Carlson*, 3 P.3d 67, 79 (Idaho Ct. App. 2000). "Based on the foregoing," the *Carlson* Court continued, "we hold that the state's use of a general intent crime—

aggravated battery of a child under twelve years of age—as a predicate for first degree

felony murder does not violate due process." *Id.* at 80.

Petitioner has not persuasively explained how her due process rights were violated

as to the mens rea requirement for her felony murder conviction, nor does the Court find

any governing case law from the United States Supreme Court to support Petitioner's

position that felony murder must be a specific intent crime. "It goes without saying that

preventing and dealing with crime is much more the business of the States than it is of the

Federal Government." *Patterson v. New York*, 432 U.S. 197, 201 (1977). The Idaho

Supreme Court is entitled to interpret Idaho's murder statutes as it sees fit, within the

bounds of due process, which it has done.

In *Gryger v. Burke*, 334 U.S. 728 (1948), the United States Supreme Court

observed:

> We are not at liberty to conjecture that the trial court
> acted under an interpretation of the state law different from
> that which we might adopt and then set up our own
> interpretation as a basis for declaring that due process has
> been denied.
>
> We cannot treat a mere error of state law, if one
> occurred, as a denial of due process; otherwise, every
> erroneous decision by a state court on state law would come
> here as a federal constitutional question.

*Id.* at 731.

Similar to the facts in this case, in *Jeffries v. Blodgett*, 5 F.3d 1180, 1194 (9th Cir.

1993), the petitioner contended the trial court had improperly defined the elements of two

statutory aggravating factors in a death penalty case, including the need for a specific

mental state. The Ninth Circuit recognized that two of the petitioner's *proposed* elements were *not* elements "as defined by the Washington Supreme Court." *Id*. at 1194. The Ninth Circuit reasoned that the "prosecution need prove only those elements of the crime which are included in the definition of the offense." *Id*. The court concluded that Jeffries' argument failed "[b]ecause it is the sole responsibility of the States to define the elements of their criminal offenses." *Id*. (citation omitted). Respondent provides a list of other similar cases to support its argument on this point. (*See* Dkt. 11 at 56.)

This is *not* a claim that there is an absence of mens rea in the jury instructions. Instruction No. 23 covers the serious nature of the felony murder statute with a general intent element: "An act is 'willful' or done 'willfully' when done on purpose. One can act willfully without intending to violate the law, to injure another, or to acquire any advantage."

The jury instructions match the battery felony murder cause of action that is contained in the statutes and interpreted by the Idaho Supreme Court. During the pretrial conference on jury instructions (State's Lodging A-6 at 4311-58), the parties labored to craft the language of the substantive cause of action instruction so that the jury would not be confused, given that, under subsection (d), malice is required but implied, and that the indictment charged Petitioner only under limited forms of battery: perpetrating "the willful and unlawful use of forced or violence upon [W.F.]." (State's Lodgings A-6 at 4320; B-1 at ECF 10). The form of battery that is a mere intentional touching was not included in the indictment or the jury instructions. *See* Idaho Code § 18-903.

Nevertheless, Petitioner argues that, because a battery can be committed by something as minimal as an intentional "touching," the Idaho Supreme Court's "interpretation elevates a battery to murder *without an accompanying mental state to commit an underlying felony*." (Dkt. 1 at 7 (emphasis added).) In addition to this argument being invalid under the discussion above, it is dispelled in this particular case by Instruction No. 19: "A 'battery is committed when a person willfully and unlawfully uses force or violence upon the person of another." (State's Lodging A-3 at ECF 197.) The jury was *not* instructed that mere "touching" can be battery, because the indictment specifically focused on a willful and unlawful use of force or violence.

Similarly, Petitioner also asserts that the battery statute's term "use of force" is not grievous enough to warrant a first degree murder conviction. However, as a deterrent against adults using force against children that causes unintended deaths, and under the circumstances of this case, the term "use of force" was not disproportionate as might have been an instruction that a "mere touch" was sufficient for a conviction, given that such use of force must be *willful and unlawful*." *See id*.

Petitioner has failed to establish the Idaho Supreme Court's decision was contrary to, or an unreasonable application of, United States Supreme Court precedent. Even under de novo review, Petitioner's claim fails. This claim will be dismissed with prejudice.

### 4.  Claim 3: Sixth Amendment Ineffective Assistance of Counsel Claim

Petitioner's ineffective assistance of counsel claim centers on three types of omitted jury instructions, which the Court will separately address.

MEMORANDUM DECISION AND ORDER - 36

### A. *Standard of Law*

The standard for Sixth Amendment ineffective assistance of trial counsel claims was identified in *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) those errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the "reasonableness" of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Under the prejudice prong of *Strickland*, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. Rather, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The *Strickland* Court instructed:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury…. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Id.* at 695-96. To constitute *Strickland* prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

## B. *State Court Action*

The state district court dismissed this claim because it failed to satisfy either *Strickland* prong. (*See* State's Lodging D-6 at 12.) The Idaho Supreme Court declined to adjudicate the first prong of the *Strickland* test, *deficient performance*, because of Idaho's "acquittal first" rule. [CITE?] The Idaho Supreme Court also determined that Petitioner could not meet the second prong, *prejudice*, as a result of Idaho's acquittal first rule. (*Id*.) That is, because the jury was required to consider whether Petitioner was guilty of first degree murder before considering any lesser included offenses, and so found, it was of no

consequence that lesser included offenses were not included, because the jury necessarily would not have considered them.

### C. *Analysis*

Here, the suggested wrongfully omitted claims seem to be more diverse than the claim brought in the state appellate court. The new parts are procedurally defaulted. Regardless, the claims fail on the merits for the reasons that follow.

i. <u>Omitted Intervening Cause Defense Jury Instructions</u>

The first argument is that counsel wrongfully omitted several intervening cause defenses:

> The evidence in the case could have easily supported a jury finding that Ms. Stanfield committed a battery on W.F. but that an intervening cause, such as a medical condition like coagulopathy, caused his death.
>
> The instructions as given required the jury under that view of the evidence to find Ms. Stanfield guilty of murder or not guilty of any crime.
>
> Or, the jury could have found that the incident was caused during a sudden quarrel or in the heat of passion but lacking in malice, as would make voluntary manslaughter appropriate. This, too, was an exceptionally plausive interpretation of the evidence: that perhaps Ms. Stanfield used force against W.F. in the heat of passion but had no malice to cause him a serious injury. Yet counsel's decision took that option away from the jury.

(Dkt. 1 at 8-9.)

As the transcript of the evidentiary hearing shows, defense counsel's theory of the case was that Petitioner did not touch the child at all; rather, the child fell and suffered injuries on his own, and the medical opinions about causation of the child's injuries and

his demise were misdiagnoses. (*See* State's Lodgings E-2.) Petitioner's proposed instructions are contrary to the theory of the case and contrary to her testimony at trial.

It is true that a defendant may defend on alternative, inconsistent theories. This strategy is much harder and less successful when the defendant testifies and the jury must accept or reject the defendant's version of the truth, as in Petitioner's case, as opposed to a case where the defendant remains silent, leaving more room for the jury to sort out and piece together the truth from other evidence, without conflicting evidence from the defendant herself. In any event, defense counsel are entitled to pursue an "all or nothing" theory of defense. *See McAfee v. Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009) (holding that "going for broke was not an unreasonable strategy"); *see also Crace v. Herzog*, 798 F.3d 840, 849 n.4 (9th Cir. 2015) ("Nothing we have said here affects a defense attorney's ability to make a strategic decision to forgo a lesser-included-offense instruction in order to force the jury into an 'all-or nothing' decision."). The benefit of an "all or nothing" strategy is that the defendant would go free if acquitted, rather than serve prison time under a lesser-included offense.

Defense counsel had no easy choices in this case when selecting a strategy. There was a problem at every turn. Stacie accused W.F.'s father of abusing W.F., while W.F.'s father accused Stacie of the same. (*See* State's Lodging E-2.)

In addition, there was some discussion during police investigations of a fact scenario that Petitioner may have roughly pulled off the child's jacket, causing him to fall against a wood curio cabinet. Counsel might have chosen a different strategy based on this scenario; however, at trial, Petitioner testified that she "did not pull his coat off," and

that investigators had bullied her into saying that she may have pulled his coat off harder than she normally would have out of frustration, and he fell backward and hit his head on a curio cabinet. (*See* State's Lodging A-6, at 4233-36, 4285-87.) Instead, at trial she testified that W.F. was trying to take off his own coat, "jerking on the front of it," "making a sound like – he was just uptight that he wasn't taking it off," and, at that point, she "turned to talk to [J.D.] and [C.D.]" (*Id*. at 4293-94.)

Defense counsel also had to grapple with Petitioner's statement at trial that she saw "[W.F.] fall straight down, straight back," but the jury also heard that she had made an earlier contradictory statement to an investigator: "'Take your coat off, [W.F.],' which is the one lying down there. 'He went like this. Makes him mad, and he threw himself back as quick as he could and hit his head on the side.'" (*Id*. at 4253.) Despite Petitioner's numerous versions of events, to solidify her stance that she never touched W.F. near or before the time he sustained his injury, Petitioner testified that, on December 11, she never jerked, grabbed, shook, or bruised W.F.; nor did she hurt his abdomen. *Id*. at 4247-48. She testified that W.F. still had his coat on when she found him unresponsive on the floor. (*Id*. at 4197-98.)

Based on the array of contradictory facts and a defendant who was going to testify, the record does not reflect that defense counsel performed deficiently in not requesting jury instructions that Petitioner *committed a battery*, but an intervening cause arose in concert with or after the battery that should compel the jury to not hold Petitioner responsible for W.F.'s death.

   ii. <u>Omission of Pre-Existing Condition Jury Instruction</u>

**MEMORANDUM DECISION AND ORDER - 41**

Petitioner next argues:

> [P]art of the theory of defense was that W.F. appeared to
> have had some type of pre-existing condition, such as
> coagulopathy (an inability to clot effectively), that
> predisposed him to a catastrophic outcome from either an
> accidental fall or a minor injury. Yet, at the jury instruction
> conference, trial counsel inexplicably told the court that he
> did not think there is a factual scenario to have [any] fit.
> State's Lodging D-6, p. 12.

(Dkt. 17 at 21; State's Lodging A-6 at 4354.)

At trial, two mid-morning videos show W.F. accompanying Petitioner on a

shopping trip to buy new toys, proving that he "was walking, he was eating, he was

talking, he was doing normal child things." (*Id*. at 4266-67.) Petitioner said that, later in

the day, W.F. tripped on the stairs and hit his forehead, but said he was "OK," and seemed

to be fine. (*Id*. at 4165, 4172.) (Other versions of the tripping incident say that W.F. hit his

*chin*.) A scheduled afternoon errand was picking up C.D. from school. When they arrived

back at daycare, Stacie was due to pick up the boys in about 15 minutes. In that short

space before Stacie arrived, the incident occurred. Petitioner called Stacie, 911, and

began CPR on W.F. (*Id*. at 4182 to 4199.)

Reviewing this claim de novo, it is clear that Petitioner's counsel *could* have asked

for this instruction, because it did not conflict with the theory of defense or with

Petitioner's planned trial testimony. This theory *would have* fit the defense strategy that

Petitioner did not touch the child, but he fell down twice that day: once when he hit his

forehead (or chin), and next when he refused to take off his jacket, and that one or both

caused his death, rather than any battery. However, this specific type of jury instruction—

that an accident, *with no predicate battery by Petitioner*, could have caused W.F.'s death—was not included in briefing on post-conviction appeal. (*See* State's Lodging D-1 at 14.) Hence, it is procedurally defaulted. Even if the Court reviews the merits of the claims under a de novo standard, it fails.

Petitioner's counsel *did* request one jury instruction that somewhat contravened the theory of defense—"Accident and Misfortune pursuant to Idaho Code Section 18-201(3)." (State's Lodging A-3 at ECF 159-63.) Defense counsel argued that the evidence supported such an instruction because, during Petitioner's interrogation with Detective Vucinich, Petitioner stated that she could have jerked the child's coat a little bit harder than she normally would, causing the child to fall. Defense counsel argued, "The jury could conclude from this evidence that the defendant inadvertently and not intentionally jerked the child's coat too hard and accidentally caused the death of [W.F.]." (*Id*. at ECF 162.)

The trial court refused to give an instruction on "accident" because it reasoned that, under the particular charging indictment, "[t]he state is required to prove a willful and unlawful use of force." (State's Lodging A-6 at 4317, 4320.) " Therefore," the trial court reasoned, "to instruct the jury that the willful and unlawful use of force or violence leading to unintended or accidental bodily harm being a defense would likely mislead the jury." (*Id*. at 4321.)

The jury instruction that is newly proposed on federal habeas corpus review is not that Petitioner's intentional acts led to an accidental death, which was rejected by the state judge, but that the child suffered an accidental fall or minor injury that had nothing

to do with Petitioner's acts. Because this has been newly-raised, the evidentiary hearing record does not contain defense counsel's testimony as to why they did not seek an instruction like this.

However, even assuming that this omission was deficient performance, this Court concludes that Petitioner has failed to show prejudice.[7] At the evidentiary hearing on the ineffective assistance of counsel claims, attorney Greg Silvey testified as an expert witness. (*See* State's Lodging E-2 at 163, *et seq*.) Silvey discussed how defense counsel held a "focus group" (mock jury) before trial to determine which strategies would be better accepted by jurors under the difficult facts of the case. (State's Lodging E-2 at 187-189.) The focus group favored a "medical misdiagnosis" theory and facts that Petitioner did not touch W.F. (*See id*. at 187.)

Importantly, however, Silvey recognized that the defense "couldn't say it was an accidental death because his spinal cord was snapped." (*Id*. at 193.) "There wasn't a great way to deal with the spinal cord injury." (*Id*.)

Further, Silvey pointed out that Petitioner's medical evidence was weak. Silvey testified: "Mr. Loschi [defense counsel] said they couldn't find an expert to explain all of the different what-the-defendant-said-just-happened-to-be-coincidences, to explain how this little child died on the spot that day." (*Id*. (hyphens added).) Mr. Loschi explained that co-counsel Edward Odessey had recorded in his notes that Dr. Label said it was a tough case to fight medically, and Dr. Nelson said that Dr. Rorke-Adams was the best of

---

[7] Because this is not a "lesser included offense" jury instruction, the "acquittal first" rule would not have barred the Idaho Supreme Court from addressing this claim on the merits, had it been presented.

the best, very honest, and that her analysis in Petitioner's case was spot on. (*Id.* at 257.)

Mr. Loschi testified that the only favorable medical expert that defense counsel could find

was Patrick Barnes, a "short fall" expert, leading to a defense theory that "[W.F.] had

problems [including some preexisting difficulty with blood clotting], and so when he

fell—when he fell and hit his head, it basically combined with his preexisting condition

and caused him to die." (*Id.* at 195-96.) This was called a "cascade of events." (*Id.*)

But the "cascade of events" theory did not explain the severed spinal cord, which

could not be caused by a "short fall" and which would have prevented the child from

standing or walking. A review of the medical evidence as a whole points overwhelmingly

to Petitioner as the perpetrator of violence upon W.F. The State had an esteemed

independent expert, whose testimony rested on treating doctors from several specialty

areas. Defense counsel could not find a doctor of the same specialty as Dr. Rorke-Adams,

because others they consulted agreed with her. Defense counsel's "short fall" expert,

Patrick Barnes, readily admitted at trial his only specialty was reviewing CT scans (*see*

State's Lodging A-5 at 2367); Barnes did not have the expertise to stand up against the

arsenal of experts, including treating specialist physicians who did not have the built-in

bias of being retained, paid experts.

While there was much inculpatory medical testimony, such as hand marks on the

child's shoulders and a very recent goose-egg on his head that did not match up to

Petitioner's story that he earlier tripped on the stairs (*see* State's Lodging E-2), the

clincher that Petitioner's expert could not explain away was that the child's spinal cord

was severed. Thus, a tremendous amount of evidence showed that the injuries could not have been from an accidental fall or minor injury.

As a result, the Court concludes that *Strickland*'s second prong is not met. There was no prejudice from Petitioner's counsel not requesting such an instruction in the face of this body of evidence. Petitioner is not entitled to federal habeas corpus relief on this claim.

     iii.    <u>Decision to Forgo Lesser-Included Offense Instructions: Deficient Performance Prong of *Strickland*</u>

Petitioner also asserts that trial counsel wrongfully decided to forgo lesser included offense instructions. Counsel affirmatively waived instructions on voluntary manslaughter, involuntary manslaughter, aggravated battery, and battery. As noted above, all of these would have contravened Petitioner's testimony at trial and her defense strategy. Because there was a firm strategy, built upon Petitioner's trial testimony, trial counsel did not perform deficiently for choosing to forgo a jury instruction that would have required the jury instruction to find that Petitioner was not telling the truth at trial—that she did, in fact, touch W.F. before or near the time of his fatal injury. The evidentiary hearing on post-conviction review clearly shows that the omission of these jury instructions was a matter of strategy, and the strategy was sound. Petitioner has failed to meet the first prong of *Strickland*, and, therefore, Claim 3 does not warrant habeas corpus relief.

iv.    Decision to Forgo Lesser-Included Offense Instructions: Prejudice
       Prong of *Strickland*

Petitioner argues that no state court has yet addressed the merits of her ineffective

assistance claim because of Idaho's "acquittal first" doctrine. (Dkt. 1 at 9.) Petitioner

argues that this state-law doctrine blocked her from having her constitutional claims

heard in state court. Respondent contrarily contends that, because the Idaho Supreme

Court addressed *Strickland*'s prejudice prong, it, in fact, addressed the merits, and its

decision is entitled to AEDPA deference.

A petitioner must establish both incompetence and prejudice to prove an

ineffective assistance of counsel case. 466 U.S. at 697. On habeas review, the court may

consider either prong of the *Strickland* test first. *Id.*

"Acquittal first" rules are not prohibited by the United States Constitution. In *State

v. Horsley*, 8 P.3d 1021 (Or. Ct. App. 2000), the Oregon Court of Appeals observed:

"Defendant has not cited a single case, and our extensive research has not found any case,

in which any court has held that an 'acquittal first' instruction violates any provision of a

state or the federal constitution." *Id.* at 1023. In *State v. Raudebaugh,* 864 P.2d 596 (Idaho

1993), the Idaho Supreme Court recognized that the United States Supreme Court had

concluded that an "acquittal first" rule violated a defendant's due process rights in a

capital case in *Beck v. Alabama*, 447 U.S. 625, 637 (1980). The *Beck* Court reasoned

that, because an acquittal first rule "forced the jury to choose between convicting the

defendant of a capital offense and acquitting the defendant of the charge completely," the

rule "created an impermissible possibility that a jury might choose to convict a defendant

for the capital crime because they believed that the defendant was guilty of some crime and did not want to acquit the defendant wholly." 864 P.2d at 600. The *Beck* Court explicitly reserved the question whether the Due Process Clause of the United States Constitution requires a lesser included offense instruction in noncapital cases. *Id*. at 638 n.14.

The Idaho Supreme Court refused to extend *Beck* to noncapital cases in *Raudebaugh*. 864 P.2d at 600-01. The Ninth Circuit Court of Appeals also refused to extend *Beck. See James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976).

Even under the most lenient standard—de novo review—Petitioner has not provided sufficient facts to show that she qualifies for federal habeas corpus relief. There is no federal constitutional mandate for lesser-included offenses in jury instructions. There certainly is none dictating that defense attorneys must request the giving of instructions that are contrary to the evidence at trial and contrary to their planned defense.

**5.  Discussion of Claims that the Idaho Supreme Court Decision was Based on an Unreasonable Determination of the Facts under 28 U.S.C. § 2254(d)(2)**

**A.  *Standard of Law***

When a petitioner contests the reasonableness of the state court's factual determinations based on the state court record, a federal court must undertake a § 2254(d)(2) analysis. *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *abrogated on other grounds as recognized in Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014). There are two general ways to challenge factual findings as unreasonable under § 2254(d)(2). "First, a petitioner may challenge the substance of the state court's findings and attempt

to show that those findings were not supported by substantial evidence in the state court record. Second, a petitioner may challenge the fact-finding process itself on the ground that it was deficient in some material way." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (internal citations omitted).

If a state court factual determination is unreasonable, or if there are no state court factual findings, the federal court is not limited by § 2254(e)(1), and the federal district court may consider evidence outside the state court record, except to the extent that § 2254(e)(2) might apply. *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014).

## B. *Discussion*

Here, Petitioner asserts without any specifics that the Idaho Supreme Court decisions at issue are based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). (*See* Dkt. 1 at 6, 7, 10.) The question is not whether the federal court would make a different factual finding, but whether the state court's findings are supported by the record. *Rodriguez v. McDonald*, 872 F.3d 908, 919 (9th Cir. 2017). This Court finds no unreasonable determinations of fact material to the issues at hand in its independent review of the state court record. To the extent that Petitioner's three claims are based on §2254(d)(2), they are denied with prejudice.

## ORDER

**IT IS ORDERED:**

1. The Petition for Writ of Habeas Corpus (Dkt. 1) is DISMISSED with prejudice.

2.      The Court finds its resolution of this habeas matter to be reasonably

debatable, and a certificate of appealability will issue on Claim 1. *See* 28

U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases.

3.      If Petitioner files a timely notice of appeal, the Clerk of Court shall forward

a copy of the notice of appeal, together with this Order, to the United States

Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of

appealability from the Ninth Circuit on other claims by filing a request in

that court.

DATED:  March 28, 2025

Honorable Raymond E. Patricco
Chief U.S. Magistrate Judge